THE STATE EX REL. ST. LOUIS YOUNG MEN'S CHRISTIAN ASSOCIATION v. FREDERICK GEHNER as Assessor of City of St. Louis, and FREDERICK GEHNER as President, and WILLIAM APPEL ET AL. as Members, of BOARD OF EQUALIZATION OF CITY OF ST. LOUIS, and EDMOND KOELN as Collector of City of St. Louis.—11 S. W. (2d) 30.

Court en Banc, October 2, 1928.

*Forrest C. Donnell, John B. Edwards, Joseph W. Lewis, George C. Mackay, S. B. McPheeters, Xenophon P. Wilfley* and *Wilbur B. Jones* for relator.

*Julius T. Muench, Charles J. Dolan* and *Arthur E. Haid* for respondents.

GENTRY, J.—This is an original proceeding instituted in this court by the St. Louis Young Men's Christian Association, a corporation organized and existing under the statute governing benevolent, religious and educational associations. Relator seeks by certiorari to annul and quash certain assessments and ·tax bills issued against three pieces of real estate owned by it in the city of St. Louis, which assessments were regularly made by the officers of that city. The City Board of Equalization having declined to comply with the request of relator that such property be declared exempt, application to this court for certiorari was made. The respondents herein are the assessing and tax-collecting officers of the city of St. Louis.

It is claimed by relator in its petition for writ of certiorari that the assessment of the three pieces of real estate belonging to it is in violation of Section 6 of Article X of the Constitution of Missouri and Section 12753, Revised Statutes 1919, both of which exempt from taxation real estate of certain size in incorporated cities and the buildings thereon, "when the same are used exclusively for religious worship, for schools or for purposes purely charitable." It is claimed by respondents, in their return, that the properties in question are not used exclusively for religious worship, for schools or for purposes purely charitable; and do not, therefore, come within the exemption authorized by the Constitution and laws of Missouri, but are subject to taxation. Relator has filed a motion for judgment on the pleadings.

The issue is clear cut. There is no dispute about the facts, counsel having filed in this court an agreed statement, which Judge SHER-WOOD some years ago said was a very good way for *lawyers* to try a case.

Relator first obtained its legal existence by a *pro-forma* decree of the St. Louis Circuit Court in 1877 under the statutes governing the organization of benevolent, religious and educational associations,

now Chapter 90, Article XI, Section 10265 *et seq.*, Revised Statutes 1919. A new charter was authorized by a *pro-forma* decree in the same court in 1898, which charter contained some amendments. From this charter, it will be seen that the object of relator is the "improvement of the spiritual, mental and physical condition of young men." Relator has two classes of members, active and associate. Any male member in good standing of a Protestant Evangelical Church may become, and thereafter during such church connection continue, an active member of the association by the payment, in advance of such membership, such fees as may be prescribed by the board of directors. Active members are elected by the board of directors. Any man of good character may become an associate member by the payment annually, in advance of membership, fees as the board of directors shall prescribe. Provision is made for the election of directors and of their qualifications, also for certain committees that function in behalf of relator. There is also provision made for discipline, amendment of the charter, etc. The names of Thomas S. McPheters, Edward P. V. Ritter, Geo. T. Coxhead, Seldon P. Spencer, and other well known St. Louis men, were signed to the petition for incorporation. It should also be mentioned that there is an age limit for members. The real estate in question and the buildings thereon were purchased and erected by contributions of many public spirited citizens of St. Louis, some of whom contributed liberally thereto. The community fund of that city helps to pay deficits in the income of relator, and relator is affiliated with some 2,000 similar organizations in the United States, each one having a large membership. Relator's membership consists of boys, young men and older men of the city, of all faiths, creeds, and colors. Relator's activities are numerous, social, athletic, musical, and patriotic, also activities that are religious, charitable and educational in their character.

Relator owns a lot at the southeast corner of Sixteenth and Locust Streets, and the building thereon, known as the "Downtown Building;" it is ten stories in height. The first floor is used for the following purposes: for men, lobby, lounge, reading and writing room, billiard room, soda fountain and part of the offices; for boys, a lobby, game and club rooms, and boys' offices, also locker rooms for both men and boys. On the ground floor is a cafeteria, barber shop, tailor shop, community boys' club, shower bath and swimming pool. The second floor is an assembly hall for general use, educational class-rooms for Y. M. C. A. School, gymnasium and office. The third floor is used for three handball courts and educational class rooms. The fourth floor is used for the office of the Metropolitan Church Federation of St. Louis, the general offices of the Y. M. C. A. and bedrooms. There are three handball courts on the fifth floor, and the

remainder of the fifth, sixth, seventh, eighth, ninth, and tenth floors are devoted to bedrooms. The total number of private rooms in this building used for sleeping purposes is 371; but no dormitory room. The rooms are rented by the week to young men desiring homes. Out of an accommodation of 500 men approximately fifteen may be accommodated on a night basis. The 371 rooms are divided into 252 single rooms and 119 double rooms. A single room rents for from $5.75 to $6.75 per week, the double rooms rent for from $3.50 to $5 per week per man. Some of the rooms in this building were endowed by churches, clubs and other organizations. Each person applying for a room receives the same subject to the approval of the board of managers, and a printed agreement regarding admission to and residence in the Downtown Building is signed by such person. The substance of this agreement is: (1) A resident must hold full privilege membership in the downtown branch; (2) Room rent is payable weekly in advance at the business office, all rents being due on Monday of each week; (3) A deposit of one dollar is required for mail box and room keys, which is refunded on surrender of keys; (4) Rooms may not be sublet, or occupied by others than those to whom they are rented; (5) Occupancy of a room for less than one week will be charged for at the transient rate, while permanent residents are charged on the weekly rate basis; (6) A notice of one week is requested before a room is vacated; (7) The association is not responsible for loss or damage to property of residents by fire, theft or any other cause; all rooms should be kept locked and valuables may be left temporarily at the business office for safekeeping; (8) Written permission from the office must be secured for the removal of baggage or express from the building; (9) The elevator operator may require showing of key, membership card, or room receipt at any time for purpose of identification; (10) The board of managers, through its officers, may at any time cancel and wholly terminate this agreement and require the vacating of a room without assigning any reason; (11) It is the purpose of the association to serve the largest number of men in as complete a way as possible; for this reason rooms cannot be rented and not used for an extended period; rooms not used for a period of two weeks may be declared vacant; (12) It is assumed that the residents of the building will at all times conduct themselves as gentlemen and in harmony with the ideals of the association; gambling, profane and obscene language, etc., are prohibited; (13) Residents are asked to keep their rooms in as good condition as they find them; wire for pictures and hangers will be furnished upon request at the office; (14) Electric wiring, lamps and fixtures must not be altered; (15) The association reserves the right of its authorized representatives to have entrance to a room at any time for the purpose of repair and inspection; (16) There is a

city ordinance against throwing anything from the windows; (17) The name of Y. M. C. A. or the telephone number must not be used on cards, letterheads or advertisements, but the address 1528 Locust may be used on personal stationery only; (18) In order to convenience the greatest number, residents are asked to refrain from loud talking after 10:30 P. M.; (19) C. O. D. packages will be accepted only when money is left at the office to cover charges; (20) No laundrymen, deliverymen or solicitors of any kind will be allowed to enter the residence halls except by permission of the secretary; laundry service is provided in the check room; (21) Women visitors will not be allowed in the residence halls except when accompanied by the secretary; (22) Failure to observe these or other regulations of the association shall be sufficient cause to terminate occupancy of the room. It happens every year that persons occupy a room in this building without paying for the same, persons who are sick, poverty stricken, or persons far from home and without friends, and sometimes men are sent to nearby boarding houses at the expense of relator. Some men who occupied rooms failed to pay and their accounts have been cancelled. In this Downtown Building relator maintains a cafeteria, to which members of the association and its friends are invited. No general invitation is extended to the public. Membership in relator is not required as a condition precedent to admission to the cafeteria. In some instances meals are served free, the record showing that in one month this happened in the case of eleven different young men. An average of 160 took breakfast per day in the cafeteria, 337 took lunch there and 165 took dinner there, the average charge for breakfast being thirty-two cents, lunch forty-one cents and dinner fifty-four cents. The soda fountain furnished an average of 150 sodas for lunch, 180 sodas for dinner, the former costing twenty-five cents and the latter twenty-one cents each. The community boys' work is located in rooms on the second floor of the Downtown Building and the program reaches about 400 boys. There is no charge of any kind made for these boys. The community boys are entitled to the privileges of the gymnasium and the swimming pool facilities the same as other boys. The charge for boys who can afford to make some payment for the service of the gymnasium and swimming pool is $3 per year for boys between the ages of nine and eleven years, $5 per year for boys between the ages of twelve and fourteen years, progressing to $24 per year for men twenty-five years and over.

Relator owns real estate situated at the corner of Grand and Sullivan Avenues, with a building four stories high thereon, known as the "Northside Building." The first floor is used for a lobby, reading and writing room for men; for a lobby, game room and read-

ing room for boys and a gymnasium for the use of both men and boys. The ground floor is used for a small cafeteria, billiard room, bowling alley, barber shop, locker rooms, swimming pool and showers. The second floor is used as an assembly room for general use, and class-rooms for educational purposes, and about ten bedrooms. The third floor consists of bedrooms and handball courts, and the fourth floor is used for bedrooms. There is no dormitory room, but there are ninety-six bedrooms, of which twelve are single and eighty-four double. Rentals are $5 per week for single rooms and $3 to $4 per week for a double room. Application to use these rooms must be made by signing an agreement, the same as in the Downtown Building. In the Northside Building cafeteria seventy-two were served for breakfast per day, one hundred and six for lunch and seventy-three for dinner, the average cost being twenty-five, forty and forty-three cents; gymnasium, swimming and billiard facilities are furnished the same as in the Downtown Building.

The third piece of real estate belonging to relator is known as the Pine Street Building at 2838 Pine Street, and is used for colored men; it is four stories high. The first floor is used for a men's lobby, boys' reading room and game room, offices, and gymnasium. The ground floor contains a small cafeteria, billiard room, locker room, swimming pool and showers. The second floor is used for educational class-rooms and bedrooms. The third floor is used for bedrooms, and the fourth floor is used for assembly room and bedrooms. There is a dormitory room in this building, containing twenty double-decker beds. There are eighty-seven rooms, of which seventy-seven are single and ten are double rooms. The charges for the rooms are the same as in the other buildings and application must also be made by signing an agreement in the same manner. Relator maintains a small cafeteria in this building to which members and their friends are invited. Membership in relator is not required as a condition precedent to admission to the cafeteria. Meals are occasionally served without charge to worthy young men, the same as in the other buildings. The average served in the cafeteria in this building is seventy for breakfast, ninety for lunch and ninety for dinner, and the average prices are respectively thirty-five, thirty-five and forty-eight cents. The charges for gymnasium, swimming and billiard facilities are the same as in the other buildings.

A large number of young men and boys of St. Louis and from other parts of the country receive accommodations in these three buildings, some paying for their services in full and others receiving said services without pay. The average young man remains in the building approximately three months. Relator is financed through membership fees, through income resulting from the serving of meals, the renting of rooms and from other activities. As stated, there has

been a substantial deficit every year which is made up by the community fund and from other sources. Salaries are paid to the secretarial staff of relator, which officers usually receive training in schools for that purpose. Relator assists young men in securing employment, in making church connections, giving advice on health and hygiene, and also in furnishing young men social, musical and literary entertainments. Members are taught to visit hospitals, and to promote athletic tournaments, field day exercises, hikes, and organize clubs for delinquent boys in congested districts.

Article II of relator's amended charter provides that members of relator must be over the age of eighteen years; and in 1926, relator adopted a rule limiting the renting of bedrooms to persons between the ages of eighteen and thirty years, except where an older man is helpful to the service program; and also providing that residents (i. e. persons renting rooms) must hold full privilege membership in relator.

The record recites a number of instances in which relator rented its rooms to different persons, from which it may be reasonably inferred that there were numerous instances similar to these. They are as follows:

Reverend A, a minister from Kansas, and his son occupied a room for several weeks, paying $8 in advance, while the minister was hunting for work. Afterwards, a New York minister sent for him and gave him work there to do. Reverend A and his son, who must have been over eighteen years old in order to occupy a room in relator's building, have not paid the balance of the rent for said room.

Mr. B came from Kansas City, and stated that he was without funds because of having lost his baggage on the bus. He rented a room from relator for five or six weeks, during which time relator tried to get a settlement from the bus company but failed. Thereupon, Mr. B returned to Kansas City, leaving his room rent for five or six weeks unpaid.

Mr. C was sent to relator by the Travelers' Aid, coming from Dallas, Texas. After remaining in one of relator's rooms for approximately a week, some friends took him on to New York. It is stated that he "had considerable problems of a personal nature, with which one of the secretaries tried to help him." He too failed to pay his room rent.

Mr. D came from Denver, was out of work and relator tried to help him find employment, furnishing him with a room for four or five weeks. He finally left St. Louis and had an opportunity to go to Chicago where work was available. It is stated that the account against him was finally dropped.

Mr. E came from Columbus, Ohio, hoping to find work in St. Louis, but was unable to do so. He was without funds and during the time

he was in St. Louis relator furnished him a room, on which no charge was made.

Mr. F rented a room from relator for three or four weeks, during which time he was said to be looking for employment and trying to get on his feet again. He finally decided to go to an aunt who lived in another city, hoping to receive aid from her. The account against him was finally cancelled.

Mr. G came from Miami, Florida, being an accountant by profession, and remained at relator's building three or four weeks. He did secure employment in St. Louis, but claimed that he did not make enough to pay his room rent. The account against him was finally dropped.

Mr. H came to St. Louis (from what place is not stated) seeking employment. He undertook to learn a new trade and lived in one of relator's rooms four or five weeks. Someone finally took him to Springfield, Missouri, to engage in the shoe business. He has never paid for his room.

Mr. I came from the city hospital, having been released from treatment there supposedly for tuberculosis. After occupying a room with relator for about three weeks, he developed an active case of tuberculosis and was sent to a sanitarium.

Mr. J was a Chinaman and his home was in Honolulu. He lived in relator's building almost a year. He was allowed to occupy one of the rooms without payment of rent for twelve weeks, in view of the fact that he was a foreigner and a long way from home. He claimed to have friends in Chicago and finally went to Chicago. His account has not been paid.

The ground belonging to relator is less than one acre, which is. the amount exempted within incorporated cities when the same is used for the purposes enumerated in our Constitution and our statute. Hence the sole question is this, is relator entitled to tax exemption on the ground and buildings erected thereon in view of the uses made of said buildings?

I. In approaching this subject, we do so with purely one object in view, the construction of our constitutional and statutory tax-exemption provisions, as affecting the real estate belonging to relator. Certain fundamental rules of taxation must at all times be borne in mind, and these have been referred to by this court on former occasions and by eminent text-writers on taxation and municipal law.

Taxation is a sovereign right of the State, and the abandonment of the right to exercise it can never be presumed; but the intention to abandon it must appear in the most clear and unequivocal terms, as was twice said by this court in early decisions and reiterated in later decisions. [Lexington v. Aull, 30 Mo. l. c. 487; Pacific Railroad v. Cass County, 53 Mo. l. c. 27.]

"An exemption from taxation must be clear and unambiguous and should not be created by implication." [Scotland County v. Railroad Co., 65 Mo. l. c. 135; State ex rel. v. Arnold, 136 Mo. l. c. 450.]

"In the construction of laws exempting property from taxation it is a cardinal principle that they must be strictly construed. As a rule all property is liable to taxation, exemption the exception, and it devolves upon the person claiming that any specific property is exempt to show it beyond a reasonable doubt.

"It is in no case to be assumed that the law intends to release any particular property from this obligation; and no such exemption can be allowed, except upon clear and unequivocal proof that such release is required by the terms of the statute. If any doubt arises as to the exemption claimed it must operate most strongly against the party claiming the exemption." [Fitterer v. Crawford, 157 Mo. l. c. 58.]

"As the burden of taxation ordinarily should fall upon all persons alike, when one claims an exemption therefrom he must be able to point to the law granting such immunity and it must be clear and unambiguous." [Exposition Driving Park v. Kansas City, 174 Mo. l. c. 433.]

"Such statute and constitutional provisions are construed with strictness and most strongly against those claiming the exemption." [Beach on Public Corp., par. 1443; Dillon on Munic. Corp. (3 Ed.) par. 776, and cases cited; 1 Burroughs on Taxation, sec. 70; 1 Desty on Taxation, p. 108; Cooley on Taxation, pp. 204-5.]

And very recently, this court by WALKER, J., said, "The policy of our law, constitutional and statutory, is that no property than that enumerated shall be exempt from taxation," [State ex rel. Globe-Democrat Pub. Co. v. Gehner, 294 S. W. l. c. 1018.]

"A grant of exemption from taxation is never presumed; on the contrary, in all cases of doubt as to the legislative intention, or as to the inclusion of particular property within the terms of the statute, the presumption is in favor of the taxing power, and the burden is on the claimant to establish clearly his right to exemption." [37 Cyc. 891; Galloway v. Memphis, 116 Tenn. l. c. 750; Willard v. Pike, 59 Vt. 218.]

We might multiply these citations by quoting from the decisions of other courts of last resort and other text-books, but all would be to the same effect.

II.   The burden therefore is upon relator to show that its property is exempt from taxation.   Learned counsel claim that it is engaged in religious, educational and charitable work, and also claim that the meaning of those terms is now extended so as to include various subjects not included in those terms at the time of the adoption of the 1875 Constitution.   But the question that we are called upon to decide is the intention of the framers of the Constitution, which document says that certain real estate, and buildings erected thereon, may be exempted from taxation, "when the same are used for religious worship, for schools or for purposes purely charitable." It may be true that the terms "religion, education and charity" now include many things not included in the general acceptation of those terms at that date.   Conceding all that relator claims on that subject to be correct, we are faced with this serious difficulty.   The operation by relator of a cafeteria in each building, where the same kind of food is served and the prices charged are the same as those at similar cafeterias in the neighborhood, and where the public may go and pay for such service, cannot be considered either religious worship, education or purely charity.   Much of the work that is done by relator is done some distance from its buildings and much of its work is done at night; hence it cannot be said that the operation of the cafeteria in the building, especially when the same is used by the public generally, is a necessary party of religious worship, nor of the educational or charitable features of the work of relator.   If relator has the right to operate one cafeteria in its building for pay, it would have the right to use its entire first floor for dining room purposes, and multiply the number of meals served and the amount of money received.

While the evidence is not clear, yet it is stated that relator operates in the Downtown Building a tailor shop, a barber shop and a soda fountain, presumably for pay.   These businesses, like that of furnishing meals, reputable though they all are, cannot be considered either religious, educational or charitable work.

We have been referred to decisions of other states, some holding that Y. M. C. A. buildings are subject to taxation and some that they are not; but on account of the difference of the wording in the constitutional or statutory exemptions, such decisions are not strictly in point.

In two cases, the one involving a Masonic Lodge building (Fitterer v. Crawford, 157 Mo. 51) and the other involving a Knights of Py-

thias Lodge building (Adelphia Lodge, K. of P. v. Crawford, 157 Mo. 356), both opinions written by BURGESS, J., it was held that both buildings were subject to taxation because certain rooms of each were rented for other than charitable purposes.

In one of the leading cases in this State, the Kemper Military School case, State ex rel. v. Johnston, 214 Mo. 656, it was held that the use of certain rooms by the proprietor of a military boarding school and his family as a residence, his wife being in charge of the home department, did not deprive the school of the exemption accorded to it by our Constitution and statute. With this decision, we are in full accord; but it is not authority in the instant case.

Later, this court had occasion to pass on a case of this relator involving two of its buildings; and after reaffirming the doctrine of the Johnston case, supra, held that the renting of a part of the Y. M. C. A. buildings for stores took away from relator the religious, educational and charitable exemption it would otherwise have had. Emphasis in that case was placed on the failure to "exclusively" use the buildings for the exempted purposes. [State ex rel. v. St. Louis Y. M. C. A., 259 Mo. l. c. 238.]

And still later this court held that the building of the Elks Lodge was not used for purposes purely charitable, as the lodge hall was used for various entertainments and bedrooms were rented to its members; this, too, in spite of the fact that the money derived from the renting of the hall and the renting of the rooms was used for charitable purposes after paying the expenses of the operation of such building. [B. P. O. E. v. Koeln, 262 Mo. l. c. 448.]

This same doctrine is recognized in the appellate court decisions from other states.

In New York, the Y. M. C. A. building had in it a public hall or theatre, which it leased from time to time at fixed rates for theatrical performances and public entertainments of various kinds and the rentals derived therefrom were applied to the benevolent and religious purposes of the association. But it was held that such use deprived the association of tax exemption. [People ex rel. v. Sayles, 32 App. Div. (N. Y.) 197; also 157 N. Y. 677; 51 N. E. 1093.]

And another Y. M. C. A. building in that state was held subject to taxation because it was not used exclusively for the purposes exempted by statute. [Y. M. C. A. v. Mayor of N. Y., 113 N. Y. 187.]

And in a case where the Y. M. C. A. building contained an auditorium in which free lectures, concerts and entertainments were given, a parlor for games and social intercourse, and reading room and a library, but had a bowling alley, open to and used by the public at a fixed price per game, and the auditorium was occasionally rented on terms satisfactory to the trustees, the court held that the property

was not exempt from taxation. [Trustees of Y. M. C. A. v. City of Paterson, 61 N. J. L. 420, affirmed, 64 N. J. L. 361, 45 Atl. 1092.]

The Pennsylvania court held that an institution of purely public charity is not, as such, exempt from taxation on property used by it in carrying on a book store in which are sold, in addition to all its own publications, other standard works, in order to aid it in making its business self-supporting, although the whole profit therefrom was devoted to charity purposes of the institution. [Amer. Sunday School Union v. Taylor, 161 Pa. 307, 29 Atl. 26.]

And the Louisiana court said that the property of an orphan's school which was no part of the institution but was held for revenue, the revenue derived therefrom being applied to the support of the school, was not exempt under a constitutional provision exempting all charitable institutions. [State ex rel. Cunningham v. Board of Assessors, 52 La. Ann. 223, 26 So. 872.]

A camp meeting was incorporated for religious, moral, charitable and benevolent purposes, but it kept a stock of groceries for sale without restriction or limitation to persons desiring to buy the same; hence it was held not exempt from taxation, although the profits of all sales were strictly applied toward the support of the camp meeting association. [Alton Bay Camp Meeting Association v. Alton, 69 N. H. 311, 45 Atl. 95.]

In a case similar to the Missouri Y. M. C. A. Building case the Supreme Court of Illinois decided that even though that association had for its object the "improvement of the spiritual, mental, social and physical condition of young men," and even though its building would be exempt when used for such purposes, yet the leasing of parts of the building to various tenants for profit subjected the building to taxation. [People ex rel. Gore v. Y. M. C. A., 157 Ill. 403, 41 N. E. 557.]

The exclusive use of a building for literary and scientific purposes in order to secure tax exemption was emphasized by the Supreme Court of Massachusetts, when it held that the keeping of a dormitory and boarding house for students in such a building was not a part of the literary or scientific work and, therefore, the building was subject to taxation. [Phi Beta Epsilon Corp. v. Boston, 182 Mass. 457, 65 N. E. 824.]

And this exclusive use of a building for religious purposes was further emphasized by the same court, when it held that one religious organization could not rent exempted property to another religious corporation without destroying such exemption. [Evangelical Baptist Missionary Society v. Boston, 204 Mass. 28, 90 N. E. 572.]

In the case of a camp meeting association, which owned ground that was exempt from taxation, when a piece of the ground was leased

to a person who regularly attended the camp meeting and who erected a cottage thereon, this use of the ground was held not to be of a religious character and therefore subjected it to taxation. [Foxcroft v. Straw, 86 Me. 76, 29 Atl. 950.]

The Methodist Episcopal Church owned and operated Baker University, which property consisted of certain real estate and buildings and was by law made exempt from taxation. One of the ministers of that church donated to the university a dwelling house and lot situated some distance away. It was claimed that this dwelling while rented and the rents used to aid Baker University, was exempt from taxation; but the Supreme Court of Kansas decided that even though the rents went into the funds of that institution, the property was subject to taxation. [Stahl v. Kansas Educational Assn. of M. E. Church, 54 Kan. 1. c. 547-8.]

The Masonic Lodge erected a three-story building, known as "Masonic Temple," used the rooms on the third floor for its meeting and committee rooms, and rented the rooms on the first and second floors, using the rentals thereof to aid in the charitable work of the lodge. The court held, however, that as portions of the property had been leased for purposes of profit, it was subject to taxation. [Morris v. Lone Star Chapter, Royal Arch Masons, 68 Texas, 698, 5 S. W. 519.]

In a similar case, where the Odd Fellows Lodge erected a two-story building, used a part thereof for its lodge room and rented a part thereof for a store and dental office, the court held that the building was subject to taxation. The following language concludes the opinion in that case: "The property is used for profit, and not for charity, and so cannot be exempt. It is said in argument that the income is used for charity, and that makes it the same in effect as if the property itself was used for charity. But that is not the letter of the law, nor its spirit." [Odd Fellows v. Redus, 78 Miss. 1. c. 355.]

The Fifteenth Ward Relief Society was a charitable organization, ministering to the poor, sick and destitute members of the community. It owned a two-story building, the upper floor of which was used continuously by its members in the furtherance of its charitable purposes; but the lower floor contained two store rooms, which were rented out and the money used for charitable purposes. After citing numerous authorities in support of its position the Utah Supreme Court said: "Only such of the society's property, therefore, as is occupied and used 'exclusively' for charitable purposes is exempt from taxation. The exemption does not extend to that portion not appropriated by the society to its own use, but held as a source of revenue." [Parker v. Quinn, 23 Utah, 1. c. 339.]

A library association owned a building, one floor of which was used for its books and historical collections, one floor for store rooms

and one as a hall, the store and hall being rented. Although the association furnished the public, and all the public, free use of its library, historical collections, and although the rents from the hall and store rooms were used exclusively to aid this public library, the court held the property subject to taxation, and that the law looks to the property, as it finds it in use, and not to what is done with its accumulations. [Library Assn. v. Pelton, 36 Ohio St. 1. c. 258.]

And in the case of the Georgia Female Seminary, the same being a charitable institution, but having a house and lot that was rented and the rent used to aid in the charitable work of the institution, the court held the property subject to taxation, and said, "As we have seen, it is the use made of the property, and not the use made of the income, from which its taxability or non-taxability must be determined." [Mundy v. Van Hoose, 104 Ga. 1. c. 300.]

The Hibernian Benevolent Society was a charitable organization for the benefit of sons of Irishmen. It owned a three-story building in the city of Portland, one floor occupied for its charitable purposes and the other two stories rented, the rentals being used for charitable purposes of the association. The court held that the property was not exempt from taxation because it came in competition with other rented property. [Hibernian Benevolent Society v. Kelly, 28 Ore. 1. c. 193.]

The Young Men's Society was a literary and scientific organization, conducted a library, and maintained a hall in which debates were conducted. It had a three-story building, the upper stories of which were used for its benevolent purposes, but the basement was leased for business purposes. The court held that on account of the use of the basement rooms, the same being commercial, the building was subject to taxation. [Detroit Young Men's Society v. Mayor, 3 Mich. 172.]

Following the Missouri case of Fitterer v. Crawford, the Supreme Court of Illinois decided that while a school was an educational and charitable organization and was exempt from taxation, yet a dwelling owned by it and used as a boarding house was not exempt. The court said: "The fact that the profits of a commercial enterprise are either in whole or in part devoted to charity does not operate to render the business itself a charity." [Congregational Pub. Society v. Board of Review, 290 Ill. 1. c. 115.]

The Odd Fellows conducted an organization for charitable purposes and raised a fund to aid in such purposes. The money was used to purchase a business block in Des Moines, and the income therefrom used to aid widows and orphans of deceased members of said lodge. In holding that the property was subject to taxation,

the Supreme Court of Iowa said: "The property being leased for business purposes, and an income obtained therefrom, its status as taxable property is thereby fixed." [Ft. Des Moines Lodge, I. O. O. F. v. Polk County, 56 Iowa, 1. c. 36.]

The Masonic Lodge owned a building in which was situated the Masonic Hall and concert hall and a room that was rented, the rents being used in behalf of the numerous charities of that worthy organization. The court held that the use of the parts of the building that were leased subjected the building to taxation. [City of Indianapolis v. Grand Lodge, 25 Ind. 1. c. 522.]

A Jewish congregation in New York owned a building consisting of two stories; the upper story was used as a synagogue, and the first story was used by the janitor of the synagogue and his family for living apartments, and also as a bathroom for women and a bathroom for men of the Jewish race, whether members of plaintiff's congregation or not. A small fee was charged of persons using the bath, which was used to pay the expenses of gas, fuel and accessories of the bath, and the remainder to assist in paying the janitor for his services. The court held that the building was subject to taxation. [Congregation of Israel v. Mayor, 52 N. Y. (Hun) 507.]

Further emphasizing the fact that the property must be exclusively used for the exempted purpose, the Supreme Court of North Carolina, after quoting the legal maxim, "*Expressio unius exclusio alterius,*" and reiterating the doctrine that taxation is the rule and tax exemption the exception, held that an educational corporation was not entitled to exemption on land that it owned and upon which it intended to erect a school building, as the building had not been erected. [Congregation of United Brethren of Salem v. Commissioners of Forsythe County, 115 N. C. 489.]

The Nebraska court, in a case almost exactly like the instant one, after detailing the numerous activities of the Y. M. C. A. of the city of Lincoln, which are identical with the activities of relator, and after discussing the operation of a cafeteria, barber shop and tailor shop in said building, used this language: "The use of the property is, under our law, the criterion by which to determine whether it is or is not exempt from taxation. It is therefore essential to determine, in the first place, whether the association, not in its aims and purposes alone, but in what it actually does to carry them out, is religious or charitable, before it can be decided that any of the uses to which the building was put partake of those characteristics." The court then held that the operation of the cafeteria, barber shop and tailor shop could not be considered either religious, educational or charitable and deprived the association of tax exemption on its building. [Y. M. C. A. v. Lancaster Co., 106 Neb. 1. c. 109.]

Quotations from other authorities to the same effect might be made, but we will simply mention such authorities: Baltimore v. St. Peter's Academy, 50 Md. l. c. 341; County of Hennepin v. Grace, 27 Minn. 503; Spiritualistic Association v. East Lynne, 54 Conn. 152; St. Joseph's Church v. Providence, 12 R. I. 19; Green Bay Canal Co. v. Outagamie County, 76 Wis. 587; Montana Catholic Mission v. County of Lewis & Clark, 13 Mont. 559; County Commissioners v. Colo. Seminary, 12 Colo. 497; Sioux Falls Elks Lodge v. Mundt, 37 S. D. 97. It will, therefore, be seen that the test for tax exemption is not the number of good purposes to which a building may be put, nor the amount of good derived by the general public in the operation of such purposes, but whether the building is used *exclusively* for religious, educational or charitable purposes. If it is used for one or more commercial purposes, it is not *exclusively* used for the exempted purposes but is subject to taxation.

The by-laws of relator provide that full membership in the association is required before one may rent a room. Yet the record discloses that this by-law has been ignored, for relator has rented its rooms to men from other cities, other states and other countries, who may well be termed transients in St. Louis, some of whom paid but others showed no disposition whatever to pay. Before renting a room, relator required the resident to execute a written agreement, in which the terms of the rental, the rights of the occupant, the time of payment and the liability of relator were fully set forth. We cannot see how the renting of a room to one not a member of relator and the execution of such an agreement can be termed religious worship, educational or charity. True, some of the occupants of the rooms claimed they were unable to pay and did not pay and doubtless never will pay, yet, there was an obligation to pay and relator accepted of pay when offered by these parties, some of whom were non-residents of the State. Relator in each building has helped many persons, many of them worthy, but such commendable acts do not authorize us to attempt to change either the statute or Constitution for the benefit of relator. The furnishing of meals and rooms free of charge may well be termed charity, but the renting of those rooms to persons not members of relator, the furnishing of meals to persons not members of relator and the operation of a barber shop, tailor shop and soda fountain for all those who cared to patronize them, are business enterprises; it cannot be said that a building used for such purposes is "used exclusively for religious worship, for schools or for purposes purely charitable."

III.   In concluding their carefully prepared and interesting brief, counsel for relator say: "We believe that the contribution which the relator makes to the city of St. Louis along the lines of education, improvement of character and reduction of crime relieves the taxpayer of a burden many times greater than the amount involved if the association paid taxes on all of its property."

This would be appropriate and possibly persuasive argument if we had it in our power to write the constitutional and statutory provisions regarding the exemption of property from taxation; but those provisions have long since been written, written by others authorized to write them, and we cannot change either "one jot or one tittle" thereof.   This court has many times been brought face to face with a proposition that has been the subject of constitutional and statutory enactment and been compelled to follow the plain language of the Constitution and of the statute, even though, in the opinion of the court, such provision should have been either broader or narrower. Our duty is to enforce the Constitution and the statute, as we find the same to exist.   It does not matter how deserving an organization may be or how much good it has accomplished by the operation of its various activities, its property is subject to taxation if it is used for purposes other than those enumerated in the exemption clauses above referred to.   Loath as we may be to decide against such a worthy organization, which counsel have correctly stated has accomplished so much good for so many of our people and which has aided so many deserving ones, we are bound by the Constitution and the statute.   We must hold that such business features of relator take from it its tax exemption privileges.

The writ of certiorari, heretofore issued, is quashed.   All concur.