FRANCISCAN TERTIARY PROVINCE OF MISSOURI, INC., a corporation, Appellant-Respondent,

v.

STATE TAX COMMISSION of Missouri et al., Respondents-Appellants.

No. 59788.

Supreme Court of Missouri, En Banc.

April 28, 1978.

Francis C. Flynn and Mark M. Wenner, St. Louis, for appellant-respondent.

James J. Wilson, Associate City Counselor, St. Louis, for respondents-appellants, State Tax Commission.

FINCH, Judge.

The Chariton Apartments, operated by Franciscan Tertiary Province of Missouri, Inc. (Franciscan) as an apartment building to house the elderly, was assessed for ad valorem tax purposes for 1973 by the Assessor of the City of St. Louis. Contending that the property was exempt from ad valorem taxation under the terms of § 137.-100(6) [1] because used exclusively for charitable purposes, plaintiff appealed to the State Tax Commission (Commission) which affirmed. On further appeal, the circuit court upheld the ruling that the property was not exempt but reversed and remanded the decision of the Commission on the ground that the assessed valuation found was excessive. The Commission was directed on remand to determine a proper deduction to be allowed for "economic obsolescence" by reason of the restrictions in the agreement between the government and Franciscan under which the property was developed. Cross-appeals by Franciscan and the Commission were taken to this court, Franciscan appealing from the decision that the property was not exempt and the Commission from the decision that the valuation was excessive. We have jurisdiction because construction of the revenue laws of the state is involved. We reverse and remand with directions.

---

1. All statutory references are to RSMo 1969 unless otherwise indicated. Sec. 137.100 thereof, in effect at the time of assessment, provided in part:

"The following subjects are exempt from taxation for state, county or local purposes:

"(6) All property, real and personal actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable, and not held for private or corporate profit, . . . ."

The above quoted portion of § 137.100(6) was reenacted as § 137.100(5), Laws 1974, p. 761, § 1, effective Jan. 1, 1975.

Sec. 137.100 was enacted pursuant to the discretion granted to the legislature to authorize tax exemptions by Mo.Const., art. X, § 6, which provides in part:

"and all property, real and personal, not held for private or corporate profit and used exclusively for religious worship, for schools and colleges, for purposes purely charitable, or for agricultural and horticultural societies may be exempted from taxation by general law."

The first question to be considered is whether this apartment building for older people was used exclusively for charitable purposes and, hence, was exempt from ad valorem taxation. As the Commission recognizes in its brief, the facts, insofar as they relate to the issue of whether the building should be exempt as being used for charitable purposes, are undisputed.

Franciscan was incorporated as a Missouri not-for-profit corporation in 1968 for the stated corporate purpose of providing, on a nonprofit basis, rental housing and related facilities and services for elderly or handicapped families and persons. Said facilities and services were to be specially designed to meet the physical, social and psychological needs of the aged or handicapped and to contribute to their health, security, happiness and usefulness in longer living.

Soon after its incorporation, Franciscan entered into a cosponsorship program with the federal government for the construction of an apartment building to house the elderly. Subsequently, Franciscan contracted for construction of Charitan Apartments, to be financed under the provisions of § 236 of Title 12, Section 1701 U.S.C., the "Senior Citizen Housing Act of 1962." The Congressional purpose stated in the Act was:

"The Congress finds that there is a large and growing need for suitable housing for older people both in urban and rural areas. Our older citizens face special problems in meeting their housing needs because of the prevalence of modest and limited incomes among the elderly, their difficulty in obtaining liberal long-term home mortgage credit, and their need for housing planned and designed to include features necessary to the safety and convenience of the occupants in a suitable neighborhood environment. Congress further finds that the present programs for housing the elderly under the Department of Housing and Urban Development have proven the value of Federal credit assistance in this field and at the same time demonstrated the urgent need for an expanded and more comprehensive effort to meet our responsibilities to our senior citizens."

Franciscan obtained a loan from a private mortgage company for $2,069,000, the total cost of the project. It gave a note and deed of trust on the property in question for said amount, the note bearing interest at 8½% per annum plus a mortgage insurance premium of ½% per annum.

The eleven-story apartment building was completed in 1972. It is a reinforced concrete structure, faced with brick. All interior partitions and finish materials are noncombustible and the building has a fire alarm system. The building contains 122 apartments of which 80 are efficiency apartments of one room and a bath and 42 are one-bedroom apartments containing a sitting room, a bedroom and bath. Each floor has a small laundry room. Basic utilities are furnished. On the main floor is the manager's office, a caretaker's apartment, a large communal lounge complete with kitchen and other facilities and a mechanical equipment area.

The residents are provided with numerous activities, such as crafts, books, movies, speakers, card parties, discussion groups, short trips for shopping and sightseeing and similar programs. The project is nondenominational in accordance with HUD regulations but religious guidance and spiritual aid is provided by visiting priests of a nearby church.

Periodic physical checkups are held at Chariton but it is not equipped or operated as a nursing home. Patients requiring such care would have to move to such a facility. There is no provision in the operation of Chariton for payment of such expenses.

If Chariton was to be a self-sustaining operation, that is, one in which income from rent was at least equal to operating expenses plus mortgage payments, rentals charged would have been $265.50 per month for the efficiency units and $326.00 per month for the one-bedroom units. In recognition of the fact that rentals in such amounts would be beyond the ability of lower income families and persons to pay, Congress authorized the Department of Housing and Urban Development (HUD) to

make interest reduction payments on behalf of the owner of rental housing projects designed for occupancy by lower income families, such amounts not to exceed the difference between the monthly payments for principal, interest and mortgage insurance premium which the owner is obligated to pay and the monthly payment for principal and interest the owner would be required to pay if the mortgage bore interest at the rate of 1% per annum. HUD administers the interest subsidy and it sets maximum rentals which may be charged where a subsidy is provided. When rentals have been fixed, they may be changed only with HUD's approval.

Under the agreement between Franciscan and the federal government, HUD was to determine a maximum basic rental charge on the basis of the project being operated with payments by Franciscan on the mortgage of principal and interest at 1% per annum. This was done on the premise that HUD would make maximum interest reduction payments authorized by the Act. On that basis HUD fixed maximum rental rates at $105.00 per month for the efficiency apartments and $126.29 per month for the one-bedroom apartments.

In fact, the subsidy actually paid by the government on behalf of Franciscan has been approximately 67% of the difference between payments due from Franciscan under its note and deed of trust and what those payments would have been if the interest rate had been 1% per annum. HUD has not been able to make larger subsidy payments due to the fact that Congress did not appropriate enough money to completely fund all of these programs. Since rentals charged were fixed on the basis of payment in full of the interest subsidy, they have not been sufficient to cover the deficiencies in the amounts paid by the government. As a result, these deficiencies have been paid by Franciscan or on its behalf by related organizations from funds other than rentals from the building. There was testimony that for the year ending June 30, 1973, the auditor's report disclosed a net loss for a one-year operation of the Apartments of $86,596.48. During this period rentals were obtained for the entire 12-month period, but mortgage payments were made for only seven months. The deficiency would have been greater if mortgage payments had been made for the entire 12-month period.

In addition to payment of the operating deficit resulting from the reduced federal subsidy, Franciscan contributed $34,000 in initial organizational and construction expenses, obtained additional land for which it gave a note for $35,000 to the Franciscan Fathers (which testimony indicated had not been and would not be paid), and provided other services (an estimated $50,000 for services of Father Mark Haegner, OFM, a housing consultant recognized as such by HUD; $6,000 for services of Sister Elizabeth, an activities director; and $2,000 in bookkeeping services).

Under the agreement and program, applicable regulations are issued by HUD. In this instance they provided that in order to qualify for the program, tenants must be 62 years of age or older, or physically handicapped or occupying substandard housing. In addition, tenants must have income below the maximum amounts specified for the area. In this instance HUD fixed those amounts at $6,480 for one person or $7,020 for two persons. There was no limitation on the amount of assets. Evidence as to the financial status of tenants was that 79% had incomes of less than $4,800, 63% had less than $4,000 and 42% had less than $3,000 gross per annum. Ninety-five per cent of the residents had assets in excess of $5,000, but only a few in excess of $8,000 to $10,000.

Franciscan administered, through HUD, a rent subsidy program available to persons whose monthly income was less than four times their monthly rental. Up to 20% of the apartments could be occupied by persons receiving rent assistance from the federal government. At the time of suit, 23 of the 142 tenants were receiving such assistance. The amount of such supplement is the difference between the monthly rental

charge and one-fourth of the tenant's income.[2]

Franciscan passed a resolution to the effect that no one would be evicted if unable to pay the rent and not successful in obtaining a federal rent supplement. The resolution also provided that Franciscan would provide food or clothing or the cost of medical treatment, if needed and the tenant was unable to pay therefor. At the time of trial, it had not been necessary to make use of these provisions for assistance by Franciscan.

In denying Chariton a charitable exemption, the Commission stated that the tenants were neither infirm nor indigent but were self-sustaining both from a physical and a financial standpoint. It concluded that even though there is a growing need to attend to the needs of the elderly and the activities provided by Franciscan were extensive and worthwhile and were beneficial to the physical, spiritual, social and psychological needs of the tenants, still the tenants were not shown to be likely burdens upon society or the government. It further stated that "[T]he activities of the petitioner, while laudable, highly desirable, and most valuable, are nevertheless not 'charitable' in that what is being done, if undone, would have to be performed by some governmental agency." Accordingly, the Commission found that the apartment building was not exempt from taxation under the charitable exemption statute.

The Commission maintains that same position in this court, citing and relying particularly on *Defenders' Townhouse, Inc. v. Kansas City*, 441 S.W.2d 365 (Mo.1969); *Paraclete Manor of Kansas City v. State Tax Commission*, 447 S.W.2d 311 (Mo.1969); and *Westminster Gerontology Foundation, Inc. v. State Tax Commission*, 522 S.W.2d 754 (Mo.1975). It contends that this case is not governed by *Missouri United Methodist Retirement Homes v. State Tax Commission*, 522 S.W.2d 745 (Mo.1975), in which a charitable exemption was permitted. It also asks for clarification as to what criteria shall govern whether a charitable exemption is to be granted for retirement projects for the elderly. However, the request is limited to a resolution of questions as between *Defenders' Townhouse* and *Missouri United Methodist*. The Commission suggests that considerable litigation has arisen since the decision in *Missouri United Methodist* and that clarification for the Commission and courts is needed.

In response, Franciscan argues that this case is governed by *Missouri United Methodist* and that the Commission erroneously determined the question of charitable exemption on the basis of the status of the objects or beneficiaries of the project (here the tenants of the apartment) and would limit charitable exemptions to instances in which relief and assistance is given to the destitute. This, says Franciscan, is not the proper test under Missouri cases for determining whether property is exempt from taxation on the basis that it is used for purely charitable purposes. Various cases construing § 137.100(6) and the constitutional language from which it is derived, including *Salvation Army v. Hoehn*, 354 Mo. 107, 188 S.W.2d 826 (banc 1945); *Bader Realty & Inv. Co. v. St. Louis Housing Authority*, 358 Mo. 747, 217 S.W.2d 489 (banc 1949); and *YMCA v. Sestric*, 362 Mo. 551, 242 S.W.2d 497 (banc 1951), are cited and discussed.

An analysis of the cases relied on to support those respective positions has led us to the conclusion that the cases considering a charitable exemption for housing for the elderly and those considering such an exemption with reference to property used for other purposes have interpreted the words "used exclusively * * * for purposes purely charitable" differently and have established different requirements for grant-

2. The regulations also require payment of "excess income" in certain cases (13 residents were paying such amounts at the time of suit). This occurs where a tenant's income, or the income of two tenants sharing an apartment and "pooling" income, exceeds the maximum allowed for eligibility. In such cases, the tenant or tenants must pay 25% of their monthly income as rent. However, all amounts paid in excess of the maximum rental charge must be remitted to the government each month, so Franciscan receives no benefit therefrom.

ing an exemption under such language. It is beyond question that the language enacted may have but one meaning to be consistently applied in all areas. For this reason, we have concluded that we must review the interpretation which has been placed on this language in all categories of exemption claims rather than attempt the limited clarification sought by the Commission with reference to cases involving only retirement homes. It is only by this broader inquiry that we can arrive at a uniform interpretation of § 137.100 (and Mo.Const., art. X, § 6) and thereby establish criteria to be considered in all cases arising thereunder.

The leading case in Missouri on what property is to be exempt from ad valorem taxation under the terms of the statute implementing Mo.Const., art. X, § 6, is *Salvation Army v. Hoehn*, 354 Mo. 107, 188 S.W.2d 826 (banc 1945). That case involved a claim of exemption for the 1943 tax year for the Evangeline Residence, a 13-story building in which the Salvation Army housed young women. The first two floors contained the lobby, a social room large enough to accommodate 35 people, a dining room and kitchen, a library, a chapel, offices, a manager's apartment, a storage room, two guest rooms, and a linen room. Each of the other 11 floors contained 17 bedrooms, each with a bath and telephone. The charges for rooms, including meals, were substantially less than those charged at commercial establishments in the area. Women and girls desiring to live there completed application forms and occupants were selected on the basis of the facts stated therein. Needy and deserving applicants were subsidized by a reduction in the rates regularly charged.

During a four-year period preceding the suit, the Salvation Army had suffered losses in the operation of Evangeline Residence of $21,754.93, $8,218.49 and $3,842.70 during the first three years, and a gain during the tax year under review of $4,427.29. The losses had been made up from general funds of the Salvation Army.

Salvation Army brought a declaratory judgment action seeking a declaration that Evangeline Residence was exempt from taxation plus an injunction against collection of taxes on the property. The petition alleged and the evidence established that the purpose of Evangeline Residence was to promote the welfare of girls and women, particularly those of lower earning capacity and income. It was intended to provide them "with board and lodging and a place of study of a homelike character under wholesome and decent influences and with proper protection and surroundings calculated to inculcate Christian character and develop good citizenship" at a price, regardless of cost, within their ability to pay.

After determining that Salvation Army was a not-for-profit organization, the court held that Evangeline Residence was entitled to exemption from taxation because used exclusively for charitable purposes. In its opinion the court overruled two earlier cases in which the YMCA had been denied exemptions, holding that the charitable exemption provision had been too narrowly construed in those cases.[3] In so ruling, the court said at 188 S.W.2d at 830:

"We think that the construction given Sec. 6, Art. 10, Constitution, in the second and third *YMCA* cases is too strict, that is, not reasonable. Such construction confines the concept of charity solely to the relief of the destitute, and excludes all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens. Prior to the second *YMCA* case the legal concept of charity, in Missouri, was not confined solely to the relief of the destitute. In the case of *In re Rahn's Estate*, 316 Mo. 492, loc. cit. 511, 291 S.W. 120, loc. cit. 128, 51 A.L.R. 877, the court quoted with approval from R.C.L., Secs. 2, 3, pp. 291, 294, as follows:

---

3. 188 S.W.2d at 831, overruling *State ex rel. St. Louis YMCA v. Gehner*, 320 Mo. 1172, 11 S.W.2d 30 (1928) and *St. Louis YMCA v. Gehner*, 329 Mo. 1007, 47 S.W.2d 776 (1932).

" 'Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. * * * A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public.' * * *"

The subsequent cases of *Goodwill Industries v. Gruner*, 357 Mo. 647, 210 S.W.2d 38 (1948); *Bader Realty & Inv. Co. v. St. Louis Housing Authority*, 358 Mo. 747, 217 S.W.2d 489 (banc 1949), and *YMCA v. Sestric*, 362 Mo. 551, 242 S.W.2d 497 (banc 1951), sometimes referred to herein as *YMCA No. 4*, all cited *Salvation Army* with approval and applied to the facts therein involved the test established in *Salvation Army* for determining whether property is used for purposes purely charitable.

In *Goodwill* the not-for-profit corporation employed handicapped workers for the purpose of training them so as to enable them to obtain jobs elsewhere. Goodwill sold the goods on which they worked. Profits received were used solely in such operations by Goodwill Industries. The court held that the business was not operated for the purpose of making profits, any profits made being purely incidental to the primary charitable objectives of employing and training handicapped workers.

The court in *Goodwill* distinguished the case of *Evangelical Lutheran Synod v. Hoehn*, 355 Mo. 257, 196 S.W.2d 134 (1946), wherein exemption was denied to a publishing corporation, organized as a subsidiary of the Lutheran Church, even though all profits made by the publishing company were turned over to the Church for use in its religious activities. In explaining the difference in the respective operations, the court said, 210 S.W.2d at 40:

"There the business was managed and operated in the same manner as any commercial enterprise for profit. True, the profits were turned over to the parent church corporation to be devoted to religious and charitable uses, but the primary purpose of the publishing company was to make profits, while the primary purpose of Goodwill is not to make profits, but to assist handicapped men and women to become self-respecting and self-supporting."

In *Bader Realty* the court held that housing units, owned and operated by the St. Louis Housing Authority, a public corporation organized pursuant to state statute and city ordinance, were used for purposes purely charitable and, hence, were exempt from ad valorem taxation. The units were rented to low income tenants and the rentals charged were insufficient to pay all operating costs of the Housing Authority. Such deficiencies were made up by sums provided by the federal government. Holding that the Housing Authority was a public charity, the court, in applying the definition of charitable adopted in *Salvation Army*, said at 217 S.W.2d at 493:

"Nothing could be more public in value or more beneficial to the community as a whole than the clearance and reconstruction of those slum areas wherein men, women and little children are crowded into hovels of such character as to wholly lack the material things and environmental values productive of good citizenship, good morals and well being."

The court found that the use of the property for rental to low income tenants was intended to improve the physical, mental

and moral condition of the tenants and was charitable in nature.

In *YMCA No. 4*, the court held exempt the residence halls held taxable under the earlier YMCA cases overruled in *Salvation Army*. In so doing, the court utilized the broad definitions of charity and charitable purposes adopted in *Salvation Army* and reaffirmed in *Goodwill* and *Bader Realty*. This was done even though, in fact, the residence halls showed an excess of income over expense in two of the three years for which assessments of the property were under attack. The court held that the purpose of the use of the property was to provide for the welfare of young men and boys, preferably low income but not limited thereto, by various means including maintenance of places of recreation and abode of a homelike and Christian character designed to foster good citizenship and Christian ideals. It determined that operation of facilities for board and lodging was intimately related to a charitable purpose and not for the purpose of making a profit.

Fundamentally, the rationale of *Salvation Army* also has been utilized in granting charitable exemption from ad valorem taxes to hospitals. *Alexian Brothers Hospital v. Powers*, 74 Mo. 476, aff'g 10 Mo.App. 263 (1881); *Community Memorial Hospital v. City of Moberly*, 422 S.W.2d 290 (Mo.1967); *Jackson County v. State Tax Commission*, 521 S.W.2d 378 (Mo. banc 1975).[4]

*Alexian Brothers*, cited in *Salvation Army*, quoted with approval language from a Massachusetts case [5] defining a charitable gift which was identical to that in *Salvation Army's* quotation from *In re Rahn's Estate*, supra. The opinion of the court of appeals, 10 Mo.App. at 268, summarized the case in these terms:

"It appears from the pleadings in the present case, that the whole object of the institution is charity; nobody connected with it can derive any profit from the work carried on there; any profit derived from pay patients is applied exclusively to the charitable purposes of the institution; and every part of the building is used exclusively for a hospital. The object being clearly charitable, and exclusively so, and all ideas of private gain, profit, or advantage being excluded, we are unable to see any reason for holding that the purpose is not 'purely charitable' within the meaning of the law."

In *Community Memorial* the court noted that most patients were able to and did pay their hospital bills and that only 5–10% were unable to pay. The hospital had a margin of income over expense each year but "[a]ll such margin of income over expenses in each year has been expended on improvement of building, facilities, equipment, services, and retirement of debt." 422 S.W.2d at 294. The court observed that the hospital facilities were available equally to both pay patients and those who could not pay and that the hospital had never operated at capacity so as to cause services to be unavailable to indigent patients. The court went on to state that such considerations as whether a profit or loss was in fact realized or sustained, or that some competition with private business exists, or that pay patients are admitted for treatment, or that a large part of its revenue is derived from pay patients, were not determinative if, from all the evidence, it could fairly be said that the actual use of the hospital property was consistent with the nonprofit feature and charitable purposes expressed in the corporation's articles of agreement. The court determined that the purpose of the hospital was not to make profits but to devote any income in its operation to the

4. While the cases of *Trustees of Local 88 v. State Tax Comm'n*, 367 S.W.2d 549 (Mo.1963) and *Frisco Employees' Hosp. Ass'n v. State Tax Comm'n*, 381 S.W.2d 772 (Mo.1964), in both of which exemption was denied, contain some language which is reminiscent of the more restricted definition of charitable which preceded *Salvation Army*, both are distinguishable on the basis that use of the hospital was restricted to members of the union and employee groups. In any event, the later cases of *Community Memorial* and *Jackson County*, which are in accord with *Salvation Army*, would govern.

5. *Jackson v. Phillips*, 96 Mass. (14 Allen) 539 (1867).

charitable purpose of operating a hospital and providing care and treatment for the benefit of all who come to its doors, whether as pay or indigent patients. Hence, it was entitled to a charitable exemption.

*Jackson County* involved the asserted charitable exemption of three hospitals in Kansas City. Their articles of incorporation and methods of operation were quite similar to those of Community Memorial Hospital. Each operated as a not-for-profit corporation. The court concluded that the law of Missouri with regard to charitable exemption of hospitals could be stated thus, 521 S.W.2d at 383:

"[P]roviding of hospital facilities for the sick in a nonprofit manner rises to a charitable purpose tax-exempt status if the same is available to rich and poor."

Although all of the foregoing cases (except *Jackson County*) interpreting and applying the language of § 137.100(6) and Mo.Const., art. X, § 6, had been decided prior to 1969, no attempt has been made to apply this body of law in the cases addressing exemption claims by homes for the aged. Instead, such claims consistently have been tested by reference to factors which we have concluded are in some respects inconsistent with the cases previously discussed.

The source of this divergent approach to exemption claims by homes for the aged may be traced to *Defenders' Townhouse, Inc. v. Kansas City*, 441 S.W.2d 365 (Mo. 1969), the first case involving such a facility to reach this court. At the outset, the opinion undertook a review of many of the earlier Missouri cases hereinbefore discussed but did not find them controlling under the facts presented. The standard adopted in *Salvation Army* and applied in subsequent cases was not adopted or applied but the opinion offered no explanation why the definition and tests of these cases were inadequate or should not be used.

Implicit in the *Defenders' Townhouse* opinion is the premise that facilities for the aged are in some way so different from other projects as to warrant inquiry into the treatment of such exemption claims in

other jurisdictions. In the process of this inquiry, numerous factors which have been deemed critical in determining exemption claims for such projects in other jurisdictions were cited with approval. However, the opinion did not undertake to discuss variations in the statutory or constitutional provisions construed in those cases. More significantly, no attempt was made in *Defenders' Townhouse* to reconcile these factors with the earlier Missouri cases (previously discussed herein) which declared the intent of the people and the legislature in adopting our own constitutional and statutory provisions. Such analysis is similarly absent from the subsequent decisions relied upon by the Commission.

Although it is difficult to be precise and pinpoint what criteria *Defenders' Townhouse* makes mandatory, it and the subsequent decisions in this area have cited and relied on one or more of the factors identified therein as persuasive in allowing or denying exemption. Some of them seem to focus on economic aspects of operation, not for the purpose of determining whether it is a not-for-profit operation, but as a substitute for concentrating on whether the property is used for a charitable purpose as was done in cases such as *Salvation Army* and *YMCA No. 4*. Furthermore, as will be discussed below, these criteria are demonstrably inconsistent with our own charitable exemption cases dealing with facilities used in areas other than retirement homes. The facts of many of these cases where exemption has been allowed reveal the same alleged deficiencies deemed to mandate denial of exemption for homes for the aged in *Defenders' Townhouse*; *Paraclete Manor of Kansas City v. State Tax Commission*, 447 S.W.2d 311 (Mo.1969), and *Westminster Gerontology Foundation v. State Tax Commission*, 522 S.W.2d 754 (Mo.1975).

For example, in all three of these cases (in all of which charitable exemption was denied), the court relied heavily on what they characterized as collection of rents sufficient to defray the entire cost of the project. In all of these cases government funding had been secured and there was a

substantial federal subsidy in the form of low interest, long term loans which made it possible for the projects to offer residency at a substantially lower cost and still break even. This factor was not taken into consideration in the conclusions that rentals covering the entire cost were charged. Loaning money to finance these homes for the aged at interest well below market rates, or providing for interest or rent subsidies, does constitute a subsidy or contribution comparable to charitable contributions from individuals or corporations. They have the same effect.

Furthermore, the foregoing cases ignored and are inconsistent with *Bader Realty*, in which an exemption was allowed. The court there emphasized that the residents did not pay the entire cost of the operation and the facts reveal that the remaining costs were paid by the federal government.

Closely related is the concern expressed in *Paraclete Manor* that rentals sufficient to pay operating expenses and amortize the loan will eventually leave the project owner holding the fee free and clear of debt. The same could be said of the residence halls in *Salvation Army* and *YMCA No. 4* where exemption was allowed. In *Community Memorial*, the court similarly allowed exemption even though, in discussing income from pay patients, it stated that "[a]ll such margin of income over expenses in each year has been expended on improvement of building, facilities, equipment, services and retirement of debt."

Another concern expressed in *Defenders' Townhouse* was the use of property as a private residence. Concern over this factor was also expressed in *Bethesda General Hospital v. State Tax Commission*, 396 S.W.2d 631 (Mo.1965), but in the context of a challenge that such use was inconsistent with the charitable purpose of *operating a hospital*. Obviously, the property was so used in *Salvation Army* and *YMCA No. 4* but, as is claimed by Franciscan, it is the provision of a place of residence in the proper environment which constitutes the charity.

In *Paraclete Manor* the court expressed concern over the lack of a fraternal fellowship or religious purpose. It ignored the fact that *Bader Realty* and *Community Memorial* did not make such a requirement. Such factors, along with others, may be considered in determining whether the property is operated for charitable purposes. They were so considered in *Salvation Army* and *YMCA No. 4* in determining whether the use of the property was conducive to the development of Christian character and good citizenship. However, they are not prerequisites to the granting of an exemption. If they were, no exemption would have been permissible in *Bader Realty* or *Community Memorial*.

No further examination of the various criteria drawn largely from other jurisdictions would be beneficial here. The purpose of the foregoing discussion is simply to demonstrate that the use of such factors in and of themselves as tests determinative of charitable exemption claims is inappropriate. When so used, the criteria above tend to substitute an imprecise formula for meaningful analysis. Many of the factors mentioned above focus on the character of the owner rather than the use of the property. This leads to the inconsistency noted above. The general nature of the owning organization—other than that it is not-for-profit—cannot be said to determine whether the use of the particular property is charitable or not. The statute clearly makes the use of the property the focus of the exemption and such is unquestionably the focal point of *Salvation Army* and the subsequent cases in other areas.

The foregoing is not to say that the factors analyzed in the retirement homes cases will be irrelevant. However, their relevance is strictly confined to the extent to which they may indicate the purpose for which the property is used and whether such purpose is charitable.

We hold that the words "used exclusively * * * for purposes purely charitable, and not held for private or corporate profit" which appear in § 137.100 should and do have the same meaning

whether applied to property used for a hospital, for training handicapped workers, for operating a YMCA type of program or for providing housing for the aged. We have also concluded that the established meaning and criteria articulated in numerous Missouri cases commencing with *Salvation Army* properly reflect the intent of the people and the legislature in enacting the constitutional and statutory exemptions for such property. We shall proceed to apply those criteria to the facts of this case. In the future tax assessors and the State Tax Commission should do likewise in determining whether a charitable exemption is to be granted. They should not look to and follow *Defenders' Townhouse* and its progeny.[6]

■ The first prerequisite for property to be exempt as charitable under § 137.100 is that it be owned and operated on a not-for-profit basis. It must be dedicated unconditionally to the charitable activity in such a way that there will be no profit, presently or prospectively, to individuals or corporations. Any gain achieved in use of the building must be devoted to attainment of the charitable objectives of the project. As demonstrated by *Evangelical Lutheran Synod v. Hoehn, supra,* an exemption will not be granted covering property which houses a business operated for the purpose of gaining a profit, even though it is turned over to a parent organization to be used for what are admittedly independently religious or charitable purposes.

■ The requirement that the property must be operated as a not-for-profit activity does not mean that it is impermissible for the project at times or even fairly regularly to operate in the black rather than on a deficit basis, provided, of course, that any

such excess of income over expense is achieved incidentally to accomplishment of the dominantly charitable objective and is not a primary goal of the project, and provided further that all of such gain is devoted to the charitable objectives of the project.

■ Another prerequisite for charitable exemption is that the dominant use of the property must be for the benefit of an indefinite number of people, for the purpose, as expressed in *Salvation Army,* of "bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." 188 S.W.2d at 830. The court at that same point included "humanitarian activities, * * * rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." Thus, it is required that there be the element of direct or indirect benefit to society in addition to and as a result of the benefit conferred on the persons directly served by the humanitarian activity.

Examples of such humanitarian activities previously held to be exempt as charitable include the operation of hospitals which are open and available to rich and poor (*Community Memorial* and *Jackson County*); a facility operated to provide employment and training for handicapped persons (*Goodwill*); operating a YMCA building housing boys and young men, preferably of low income, as a part of a program intended

---

**6.** These include *Paraclete Manor* and *Westminster Gerontology.* Also included is *Missouri United Methodist Retirement Homes v. State Tax Comm'n,* 522 S.W.2d 745 (Mo.1975), insofar as it recognizes or approves of the criteria established by the foregoing cases for determining the right of retirement homes to charitable exemption.

The fact that we hold that in this case and henceforth the definition of "used exclusively

* * * for purposes purely charitable," established in *Salvation Army* and subsequent cases cited herein, should be used in deciding whether housing for the elderly is entitled to charitable exemption does not mean that we are holding that a different result would have been reached in the various cases commencing with *Defenders' Townhouse.* Such questions are not before us and we express no opinion thereon.

to foster good citizenship and Christian ideals in those boys and young men (*YMCA No. 4*); providing housing at less than cost to girls and young women, including the needy, intended to promote the welfare of such persons (*Salvation Army*); providing good low cost housing for low income people to replace old, delapidated properties in a slum area which was cleared (*Bader Realty*). All of these, while benefitting the individuals served, also were considered to benefit society generally.

■ Chariton provided one room efficiencies and one bedroom apartments for elderly low income people at considerably less than cost. Charges therefor on a self-sustaining basis would have been $265.50 and $326.00 per month but these were furnished at less than half those sums, *viz.*, $105.00 and $126.29. These were furnished to people, most of whom had incomes of less than $400 per month and almost half of whom had incomes of $250.00 per month or less. These income levels were within eligibility requirements for government supported public housing but such was not available to most Chariton residents because they had assets of between $5,000 and $10,000. Even so, approximately one-sixth of the residents received some governmental support in the form of a monthly rent supplement or subsidy. Furthermore, their assets were so limited that, absent availability of low cost quarters such as those provided in Chariton, their assets could have been depleted quickly so as to place them in public housing or, if not so placed, in substandard housing under conditions conducive to increasing the problems of government and society.

In *Bader Realty* this court held that the low cost housing furnished by the Housing Authority for rental to low income tenants was entitled to a charitable exemption from ad valorem taxes. Such housing was considered to benefit society and lessen the likelihood of burdens on government. The only appreciable difference between that case and the one we now consider is the fact that a slum area had been cleared and decent low cost housing erected in lieu thereof and the fact that the Housing Au-

thority was a public corporation. However, that does not provide a sufficient distinction upon which to base the granting of an exemption to Housing Authority and the denial thereof to Franciscan. In both cases the exemption is on property used as low cost housing furnished to low income tenants. Both have the objective of furnishing housing not otherwise available. In both instances it is made possible by reason of the expenditure of governmental funds. In this case the funds were furnished pursuant to the "Senior Citizen Housing Act of 1962" by which the Congress recognized a public and a governmental problem and undertook thereby to help provide needed low cost housing for older people.

A retirement center such as Chariton clearly serves an important social need. Such was expressly recognized by the Commission in its findings. Such projects are much more than a building with physical characteristics tailored to the often more limited mobility of its tenants. As the evidence in this case overwhelmingly suggests, such centers are designed and operated to encourage continued activity and further development. Through discussion groups, speakers, social activities, short trips, etc., plus periodic physical checkups, the continuing vitality and health of the residents is maintained. The Commission specifically found that the activities provided were extensive and worthwhile and were beneficial to the physical, spiritual, social and psychological needs of these elderly tenants. Such activity and the continued companionship available in such projects does help prolong life and health by reaffirming the sense that life is worth living, that society cares.

■ In its conclusions of law in support of its decision to deny a charitable exemption, the Commission, relying on statements in *Defenders' Townhouse* and the cases applying its reasoning, expressed doubt that the tenants would consider themselves objects of charity and emphasized that they were not indigent. This is but further evidence of the inappropriate focus of such cases. In other areas, we have often reaffirmed the premise of *Salvation Army* that

charity is not limited to relief of the destitute. *YMCA No. 4* and *Community Memorial* are examples. Furthermore, we cannot believe that it is the intent of the people under § 137.100 to withhold the financial assistance of a tax exemption until such time as our elderly are totally incapable of providing for themselves. The whole thrust of projects such as Chariton is to assist its tenants in avoiding such status by providing an atmosphere where they can remain self-sustaining as long as possible. The payment of monthly rent at Chariton and similar projects may for some be as important as the other valuable activities. Although federal or other assistance is obviously being provided, the sense of paying one's own way can be an important intangible which reaffirms continued vitality and dignity.

■ We do not believe that it may be said the benefits thus rendered to society are in any way less direct than those of *YMCA No. 4* or the other residence halls cases. There was no assertion in those cases that the government was under any present duty to provide the type of facilities under review. Rather, such projects are said to build character and develop good citizenship, thereby contributing to the public welfare. In the present case, aside from furthering the moral well being of the tenants, the activities of the Chariton center are designed to reduce the likelihood that its residents will ever become public charges.

■ The fact that subsidization of part of the cost of furnishing such housing is by the government rather than private charitable contributions does not dictate a different result. If it did, the result in *Bader Realty* would have been otherwise. In this case, we actually have some substantial private charitable contributions in that Franciscan and affiliated organizations did contribute money and services, but the contribution to the project could have been solely from government funds as it was in *Bader Realty*.

■ The fact that rentals charged were to be applied in part to retirement of principal and interest incurred in acquiring or building the property in question does not dictate a denial of a charitable exemption if the facts otherwise support such an exemption, as they do here. *Salvation Army* spoke with approval of humanitarian services furnished at cost or less and in *Community Memorial* the court, in discussing income from pay patients, stated that "[a]ll such margin of income over expenses in each year has been expended on improvement of building, facilities, equipment, services, and retirement of debt." Such use of funds derived from patients did not disqualify the hospital from being granted a charitable exemption. It follows that the fact that rentals from tenants in Chariton were utilized in helping to retire principal and interest incurred in acquiring the building does not disqualify Franciscan from being granted a charitable exemption.

We conclude that Chariton meets the test of *Salvation Army* and the subsequent cases which relied upon and followed *Salvation Army* for being entitled to a charitable exemption under § 137.100. Franciscan is a not-for-profit corporation whose clearly stated purpose was to operate a rental facility for the aged on a non-profit basis. It did not operate at a profit. It contributed some of its own funds to supplement rentals received in order to meet expenses of operating Chariton. No profit to any individual or corporation may result even if the full subsidy contemplated is eventually realized. Chariton, for the reasons we have indicated, was operated for purposes purely charitable within the meaning of § 137.100. In view of our conclusion that Franciscan was entitled to charitable exemption from ad valorem property taxes on the Chariton apartments, we need not reach questions presented by the Commission's appeal concerning the valuation of the property.

The judgment is reversed and the cause remanded for the entry of a judgment consistent with the views here set forth, and for such other proceedings as are appropriate.

MORGAN, C. J., and BARDGETT, HENLEY, RENDLEN and SEILER, JJ., concur.

DONNELLY, J., concurs in result.