TRI–STATE OSTEOPATHIC HOSPITAL ASSOCIATION, d/b/a Oak Hill Hospital, a Missouri not-for-profit Hospital Association, Plaintiff–Appellant,

v.

Claude BLAKELEY, Newton County Collector, Defendant–Respondent.

No. 19648.

Missouri Court of Appeals, Southern District, Division Two.

April 27, 1995.

Motion for Rehearing or Transfer to Supreme Court Denied May 17, 1995.

Application to Transfer Denied June 20, 1995.

Paul G. Taylor, Myers, Taylor and Whitworth, P.C., Joplin, for plaintiff-appellant.

John Sims, Sims, Dolence & Higdon, Neosho, for defendant-respondent.

GARRISON, Presiding Judge.

Appellant, Tri–State Osteopathic Hospital Association (Tri–State), filed suit against Respondent, Claude Blakeley, the Newton County Collector, and Don Brady, City of Seneca Collector, seeking a refund of ad valorem real estate taxes paid under protest for the years 1990 and 1991. The taxes were assessed on a medical clinic in Seneca, Missouri which Tri–State owns and operates. In the suit, Tri–State claimed that the clinic property was "under Section 137.100(5) exempt from said taxation in that it is actually and regularly used exclusively for purposes purely charitable, to-wit, to provide medical care and treatment as an adjunct part of Plaintiff's not-for-profit IRS Code 501 C(3) hospital operations."

Tri–State is a not-for-profit corporation, which is also exempt from income taxation under I.R.C. § 501(c)(3). It also owns and operates Oak Hill Hospital in Joplin, Missouri (Hospital), which is exempt from city and county real estate taxes pursuant to the charitable exemption under § 137.100(5), RSMo 1994. In 1988 it purchased a building in Seneca previously used as a medical clinic (clinic). Tri–State leased the clinic to Dr. Mounts, an osteopathic physician, until 1990 at which time Tri–State began operating the clinic with its own employees. At that time it also contracted with Dr. Mounts for him to continue to provide his services at the clinic. The contract provided that Dr. Mounts would be paid a monthly salary but also contained the following:

Physician shall be paid, in addition to the regular contract compensation provided for by this Agreement, an additional contract sum in an amount equal to fifty percent

(50%) of the net profit generated by Physician and collected by the Hospital during the term of this Agreement. This additional contract sum, if any, is to be determined from the books and records of the Seneca Clinic and shall be payable to Physician within thirty (30) days after the termination of this Agreement.

The trial court initially entered a summary judgment in favor of Tri–State which we held was error in *Tri–State Osteopathic Hospital v. Blakeley,* 848 S.W.2d 571 (Mo.App.S.D. 1993). Upon remand, the trial court held in favor of Respondent (Collector),[1] finding that the clinic was not dedicated unconditionally to Tri–State's charitable activity in that Dr. Mounts was entitled to receive 50% of any potential profit generated by him.

In its sole point on this appeal, Tri–State contends that there was insufficient evidence to support the trial court's finding in that the contract provision concerning division of profits was "in fact part of a reasonable compensation agreement for services Tri–State required to accomplish its charitable mission." We affirm.

In *Tri–State Osteopathic Hospital v. Blakeley,* 848 S.W.2d at 575, we recited the applicable principles concerning claims of exemption from taxation as follows:

> Taxation is the rule and exemption is the exception, *Missouri Church of Scientology v. State Tax Comm'n,* 560 S.W.2d 837, 844 (Mo. banc 1977), and *Midwest Bible & Missionary Inst. v. Sestric,* 364 Mo. 167, 174, 260 S.W.2d 25, 30 (1953); claims of exemption from taxation are not favored in the law, *Community Memorial Hospital v. City of Moberly,* 422 S.W.2d 290, 294 (Mo. 1967); statutes which grant exemption from taxation must be strictly, but reasonably, construed against the party seeking the exemption, *Iron County v. State Tax Comm'n,* 437 S.W.2d 665, 668 (Mo. banc 1968), and *Community Memorial Hospital,* 422 S.W.2d at 294; and the party who claims exemption from taxation bears a substantial burden to prove that the prop-

erty is within the exempted class, *City of St. Louis v. State Tax Comm'n,* 524 S.W.2d 839, 844 (Mo. banc 1975).

*See also S.S. Bd. Of S. Baptist Convention v. Mitchell,* 658 S.W.2d 1, 4 (Mo. banc 1983).

Section 137.100(5) relied on by Tri–State provides, in pertinent part:

> The following subjects are exempt from taxation for state, county or local purposes:
>
> . . . .
>
> (5) All property, real and personal, actually and regularly used exclusively for ... purposes purely charitable and not held for private or corporate profit, except that the exemption herein granted does not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom is used wholly for ... charitable purposes;
>
> . . . .

The Missouri Supreme Court has construed § 137.100(5) as requiring certain prerequisites in order to establish that property is actually and regularly "used exclusively ... for purposes purely charitable, and not held for private or corporate profit" and therefore exempt from taxation under the statute. *Franciscan Tertiary Prov. v. State Tax Com'n,* 566 S.W.2d 213, 223–224 (Mo. banc 1978). The court said:

> The first prerequisite for property to be exempt as charitable under § 137.100 is that it be owned and operated on a not-for-profit basis. It must be dedicated unconditionally to the charitable activity in such a way that there will be no profit, presently or prospectively, to individuals or corporations. Any gain achieved in use of the building must be devoted to attainment of the charitable objectives of the project.... [A]n exemption will not be granted covering property which houses a business operated for the purpose of gaining a profit, even though it is turned over to a parent organization to be used for what are admit-

---

1. Although the Seneca Collector was originally named, he did not appeal the entry of the summary judgment which was the subject of the original appeal in this case. He is not shown as a party to the judgment which is the subject of this appeal and is not a party to these proceedings.

tedly independently religious or charitable purposes.

The requirement that the property must be operated as a not-for-profit activity does not mean that it is impermissible for the project at times or even fairly regularly to operate in the black rather than on a deficit basis, provided, of course, that any such excess of income over expense is achieved incidentally to accomplishment of the dominantly charitable objective and is not a primary goal of the project, and provided further that all of such gain is devoted to the charitable objectives of the project.

*Id.* at 224. The court also said that the dominant use of the property must be for the benefit of an indefinite number of people with a direct or indirect benefit to society in addition to and as a result of the benefit conferred on the persons directly served by the activity. *Id.* The court in *Franciscan* made it clear that the focus of the charitable exemption provisions is the "use of the property" and that the "general nature of the owning organization—other than that it is not-for-profit—cannot be said to determine whether the use of the particular property is charitable or not." *Id.* at 223.

In the instant case, the evidence indicated that the clinic had not realized a profit since Tri–State began operating it. The contractual provision providing for the division of profits, however, indicates that the clinic was not dedicated unconditionally to charitable activities so that there will be no profit, at least prospectively, to individuals or corporations as required under the *Franciscan* interpretation of § 137.100(5). In finding exemptions under § 137.100, courts have noted compliance with the requirement that no such profits could result. *Pentecostal Church of God v. Hughlett,* 737 S.W.2d 728, 730 (Mo. banc 1987); *Franciscan Tertiary Prov. v. State Tax Com'n,* 566 S.W.2d at 226; *Affiliated Medical Transport v. State Tax Com'n,* 755 S.W.2d 646, 651 (Mo.App.E.D.1988).

The only witness at the trial of the instant case was the hospital's chief financial officer who testified that part of the reason for the contractual provision concerning division of profits was to give the doctor some hope that he might get some profit in the future. He also called the provision for profits "incentive compensation." Obviously, the requirement that there be no prospective profit to an individual from the operation of the property was not satisfied in the instant case.

We also note, in the instant case, that many provisions of the contract indicated that the clinic was functioning much the same as any other medical clinic being operated for profit. While such a comparison is not controlling, it can be useful in determining whether property is exempt from taxation pursuant to § 137.100(5). *Missouri Conference Association of Seventh Day Adventists v. State Tax Com'n,* 727 S.W.2d 940, 944 (Mo.App.W.D.1987).

The contract between Tri–State and Dr. Mounts provided that his duties included "marketing the services of the Seneca Clinic ... so as to build an active general practice"; he was required to "maintain a hospital type practice similar in scope and role to that developed by [him]" during the time he leased the facility from Tri–State, "including but not limited to admitting and managing the care of patients at Hospital," but he was not required to use that hospital to the exclusion of others; he agreed "in cooperation with Hospital to develop and build a nursing home practice in the southwest Missouri area, and further ... to participate in any managed care plans or groups deemed appropriate by Hospital"; and he agreed to "seek affiliations for [himself] and on behalf of the Seneca Clinic with health care payment plans and managed care groups and further ... to otherwise participate actively with Hospital in marketing the Seneca Clinic." Under the contract, the Hospital was to set all the pricing for services and supplies which was to "be reasonable for the geographic area concerned and ... comply with all Medicare and Medicaid reimbursement requirements." In addition to his salary and 50% of the profits, the contract provided that Dr. Mounts would receive "[a]dditional contract compensation ... in such amounts, if any, and at such time or times as Hospital in its discretion may from time to time determine." The Hospital could terminate the agreement "upon a material decline in [his]

admissions at Hospital or volume of practice as measured against statistics available to Hospital regarding [his] practice" when he operated the clinic himself. Finally, the contract provided that Dr. Mounts could not engage in the practice of medicine within 30 miles of the Joplin or Seneca city limits for a year after the contract was terminated.

Presumably, Dr. Mounts operated the clinic on a "for profit" basis during the time that he leased it from Tri–State. When Tri–State began operation of the clinic, it contractually bound Dr. Mounts to actively market the clinic's services and maintain a practice similar to that which he had previously conducted there. If he failed to maintain his admissions to Oak Hill Hospital and the volume of his previous practice without material change, the contract could be terminated. There is also no indication that the charges for services rendered would be any different than those charged by the rest of the medical community.

In *S.S. Bd. of S. Baptist Convention v. Mitchell*, 658 S.W.2d 1, the Missouri Supreme Court held that a Baptist bookstore operated by the Bookstore Division of the Sunday School Board of the Southern Baptist Convention was not entitled to a charitable exemption under § 137.100(5). The court said:

> This bookstore is not substantially different from any other religious bookstore. It sells to all members of the general public as well as to churches and Sunday schools. The literature it sells is not purely denominational. [Citations omitted.] Its sales, for the most part, are made at competitive retail prices. There is no indication that merchandise is provided to anyone at or below its cost to the bookstore. [Citations omitted.] In short, the Baptist Book Store's operation is similar to that of other retail bookstores.

*Id.* at 5–6. Concerning the requirement under *Franciscan* that the property must be owned and operated on a not-for-profit basis, the court held that it could not say that profit was not a primary goal of the bookstore. In doing so, it noted the language in *Franciscan* that an exemption will not be granted covering property which houses a business operated for the purpose of gaining a profit, even though it is turned over to a parent organization to be used for religious or charitable purposes. *Id.* at 6. It said:

> There must be a more significant nexus between profits earned through use of the property for which an exemption is sought and the use that is made of those profits. A business cannot compete for profit and then seek to insulate itself from taxation by claiming that its profits are used to attain a religious or charitable purpose.

*Id.*

Based on the above, we are unable to conclude that Tri–State satisfied its burden of proving that the property in question is exempt under the provisions of § 137.100(5). Accordingly, we affirm the judgment of the trial court.

PREWITT and PARRISH, JJ., concur.