The SUNDAY SCHOOL BOARD OF the
SOUTHERN BAPTIST CONVENTION,
d/b/a Baptist Book Store, Respondent,

v.

James P. MITCHELL, Director of
Revenue of Jackson County,
Missouri, Appellant.

No. 64495.

Supreme Court of Missouri,
En Banc.

Sept. 20, 1983.

Rehearing Denied Oct. 18, 1983.

Michael F. Dandino, John B. Williams, Norma K. Stratemeier, Kansas City, for appellant.

1. All statutory references are to RSMo 1978.

Thomas F. Schlafly, St. Louis, for respondent.

WELLIVER, Judge.

The question in this case is whether respondent's Kansas City religious bookstore is operated "for purposes purely charitable" within the meaning of Mo. Const. art. X, § 6 and § 137.100(5), RSMo 1978,[1] so that the bookstore's real and personal property is exempt from Jackson County ad valorem property taxes.

I

The facts are stipulated.

Respondent, the Sunday School Board of the Southern Baptist Convention, is a Tennessee not-for-profit corporation. It is governed by a board of trustees elected by the Southern Baptist Convention and operates under the rules and regulations prescribed by the Convention. Its business affairs must be conducted in accordance with the business and financial plan of the Convention. It is a tax exempt organization under I.R.C. § 501(c)(3) (1976), and contributions to it are deductible under I.R.C. § 170 (1976 & Supp. V 1981) as charitable contributions.

Respondent exists, according to its restated corporate charter, to

support the Southern Baptist Convention in its task of bringing men to God through Jesus Christ by making available Bibles, lesson courses and materials, books, audiovisuals, music and recordings, and church supplies and by fostering Christian education, Sunday Schools, and service programs which will help the churches to establish, conduct, enlarge, and improve their ministries of Bible teaching and Christian training.

Respondent is authorized by its charter to "carry on, perform, and do any other act or thing necessary" to fulfill these purposes.

In furtherance of these purposes respondent's Bookstore Division maintains and operates a network of facilities throughout the United States for the distribution of religious literature and supplies. Among

these facilities is the Baptist Book Store at 1017 Grand Avenue in Kansas City. It stocks religious literature and supplies for sale to churches, Sunday schools, and members of the general public. Approximately two-thirds of its sales are to churches and Sunday schools, and approximately one-third are to individuals. Something less than half of the items the Baptist Book Store sells are also carried by commercial retailers. The Baptist Book Store charges prices comparable to those charged by commercial retailers, except that church libraries receive a twenty percent discount.

Through the fiscal year ended September 30, 1981, the profit and loss statements of the Baptist Book Store indicated that the store had sustained significant losses for four consecutive years.[2] A breakdown of the figures, however, indicates that for the years 1980 and 1981, the years at issue here, the Baptist Book Store actually generated a small profit. In those years the margin contribution, the amount sales exceeded the cost of sales, was greater than the combined amounts deducted for local operating expenses and the store's proportioned share of

the Bookstore Division's expenses. A loss appeared only after deduction of the Baptist Book Store's proportioned share of the general and administrative expenses of the Sunday School Board as a whole.

For the years 1980 and 1981 respondent paid an aggregate of $13,612.19 in Jackson County merchants and manufacturers inventory taxes, business personal property taxes, and real property taxes under protest pursuant to § 139.031. It brought this action to recover the amount paid under protest, contending that the Baptist Book Store was exempt from such taxation because it was operating "for purposes purely charitable" within the meaning of Mo. Const. art. X, § 6 and § 137.100(5). The trial court "[found] the issues in favor of the Plaintiff and against the Defendant" and entered judgment for an aggregate of $13,612.19 plus costs. From this judgment appellant, the Jackson County Director of Revenue, appeals. We reverse.

II

Article X, § 6 of the Missouri Constitution provides that "all property, real and

2. The statement of income and expenditures for the Baptist Book Store for the fiscal years ended in 1978 through 1981 shows the following:

| | FYE 9-30-78 | FYE 9-30-79 | FYE 9-30-80 | FYE 9-30-81 |
|---|---|---|---|---|
| Sales | $ 435,012 | $ 488,779 | $ 498,722 | $ 540,338 |
| Cost of Sales | (264,171) | (297,595) | (293,383) | (331,380) |
| Margin Contribution | $ 170,841 | $ 191,184 | $ 205,339 | $ 208,958 |
| Operating Expenses | (157,465) | (170,933) | (167,680) | (173,078) |
| Central Division Expenses | (22,838) | (27,048) | (28,984) | (28,290) |
| General & Administrative Expenses | (35,188) | (44,466) | (38,207) | (47,270) |
| | $ (44,650) | $ (51,263) | $ (29,532) | $ (39,680) |
| Other Income (Loss) | (1,080) | (1,430) | (2,663) | 1,119 |
| Net Contribution (Loss) | $ (45,730) | $ (52,693) | $ (32,195) | $ (38,561) |

The "Operating Expenses" are those local operating expenses of the Baptist Book Store, including rent, utilities, personnel salaries, and advertising. The "Central Division Expenses" are the expenses of the Bookstore Division headquarters in Nashville, Tennessee, that are allocated to the Baptist Book Store according to the ratio of the Baptist Book Store's sales to the total sales of the Bookstore Division.

Those expenses include the Division's personnel salaries and advertising for all stores in the region. The "General & Administrative Expenses" are the overhead expenses of respondent Sunday School Board allocated to the Baptist Book Store according to the ratio of the Baptist Book Store's sales to the total sales of the Sunday School Board. Those expenses include the costs of payroll and accounting.

personal, not held for private or corporate profit and used exclusively for religious worship . . . [or] for purposes purely charitable . . . may be exempted from taxation by general law." Pursuant to this constitutional authorization the legislature enacted § 137.100(5), which provides:

The following subjects are exempt from taxation for state, county or local purposes:

. . . .

All property, real and personal, actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable and not held for private or corporate profit, except that the exemption herein granted does not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom is used wholly for religious, educational or charitable purposes[.]

Respondent cannot, and does not, contend that the Baptist Book Store is used "for religious worship." Its only contention is that the store is used "for purposes purely charitable" within the meaning of these sections.

### A

In considering respondent's claim for exemption we are guided by several well-established principles. Taxation of property is the rule, and exemption from taxation is the exception. *Missouri Church of Scientology v. State Tax Commission,* 560 S.W.2d 837, 844 (Mo. banc 1977), *appeal dismissed,* 439 U.S. 803, 99 S.Ct. 57, 58 L.Ed.2d 95 (1978); *Midwest Bible & Missionary Institute v. Sestric,* 364 Mo. 167, 174, 260 S.W.2d 25, 30 (1953). Statutes granting exemptions from taxation are to be construed strictly, but reasonably, against the party claiming the exemption. *Iron County v. State Tax Commission,* 437 S.W.2d 665, 668 (Mo.1968); *Community Memorial Hospital v. City of Moberly,* 422 S.W.2d 290, 294 (Mo.1967); *Midwest Bible,* 364 Mo. at 174, 260 S.W.2d at 29. Claims for exemption are not favored in the law,

*St. John's Mercy Hospital v. Leachman,* 552 S.W.2d 723, 725 (Mo. banc 1977); *Community Memorial Hospital,* 422 S.W.2d at 294, and a property owner who claims exemption bears a substantial burden to prove that his property falls within the exempted class, *Missouri Church of Scientology,* 560 S.W.2d at 844; *St. John's Mercy Hospital,* 552 S.W.2d at 725; *City of St. Louis v. State Tax Commission,* 524 S.W.2d 839, 844 (Mo. banc 1976).

### B

Our most recent case defining the scope of the charitable exemption is *Franciscan Tertiary Province v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc 1978), which involved a claimed exemption on housing for the low income elderly. In *Franciscan* the Court, faced with two distinct, and inconsistent, lines of cases interpreting the scope of the charitable exemption, reaffirmed those cases beginning with *Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826 (banc 1945), which defined a charity as

a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. . . . A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public.

*Id.* at 114–15, 188 S.W.2d at 830. Charity is not limited "solely to the relief of the desti-

tute" but instead includes "all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." *Id.* at 114, 188 S.W.2d at 830.

■ After arriving at this "uniform interpretation" of Mo. Const. art. X, § 6 and § 137.100(5), the Court in *Franciscan* proceeded to "establish criteria to be considered in all cases arising thereunder." *Franciscan,* 566 S.W.2d at 219. First, the property must be "owned and operated on a not-for-profit basis" so that there can be "no profit, presently or prospectively, to individuals or corporations." *Id.* at 224. The property need not always be operated at a deficit, but any profit must be "achieved incidentally to accomplishment of the dominantly charitable objective" and may not be "a primary goal of the project." *Id. See Missouri Goodwill Industries v. Gruner,* 357 Mo. 647, 652, 210 S.W.2d 38, 41 (1948).

Second, the property "must be dedicated unconditionally to the charitable activity." *Franciscan,* 566 S.W.2d at 224. This requirement stems from the statutory mandate that the property be "used exclusively" for charitable purposes, § 137.100(5), within the *Salvation Army* definition of charity, *see Barnes Hospital v. Leggett,* 589 S.W.2d 241, 244 (Mo. banc 1979). Third, "the dominant use of the property must be for the benefit of an indefinite number of people," and there must also be "direct or indirect benefit to society in addition to and as a result of the benefit conferred on the persons directly served by the humanitarian activity." *Franciscan,* 566 S.W.2d at 224. *Cf. City of St. Louis,* 524 S.W.2d at 846 ("the controlling factor is the extent to which such activity is designed to benefit the public and society in general").

■ The Court thus made it clear that the language of the charitable exemption provisions "makes the use of the property the focus of the exemption" and that the "general nature of the owning organization—other than that it is not-for-profit—cannot be said to determine whether the use of the particular property is charitable or not." *Franciscan,* 566 S.W.2d at 223. With these principles in mind, we turn to the facts of this case.

### III

A number of humanitarian activities have been found to fall within the charitable exemption. Those activities, cited with approval in *Franciscan,* include the operation of hospitals that are open and available to both rich and poor, *Jackson County v. State Tax Commission,* 521 S.W.2d 378 (Mo. banc 1975); *Community Memorial Hospital;* the operation of a facility to provide employment and training for the handicapped, *Goodwill;* the operation of a YMCA facility to house boys and young men, preferably of low income, as part of a program designed to foster in them good citizenship and Christian ideals, *YMCA v. Sestric,* 362 Mo. 551, 242 S.W.2d 497 (banc 1951); the provision of housing at less than cost to girls and young women, including the needy, *Salvation Army;* and the provision of good, low cost housing for low income persons to replace old, dilapidated property in a cleared slum area, *Bader Realty & Investment Co. v. St. Louis Housing Authority,* 358 Mo. 747, 217 S.W.2d 489 (banc 1949). *Franciscan* itself involved the provision of housing for elderly low income people at considerably less than cost.

■ Assuming that respondent's religious purpose is a charitable one, we do not believe the Baptist Book Store that respondent operates is a charity in the sense in which these cases and others have consistently used that term. This bookstore is not substantially different from any other religious bookstore. It sells to all members of the general public as well as to churches and Sunday schools. The literature it sells is not purely denominational.[3] *Compare*

---

3. We note that in the 1983 edition of the Yellow Pages the Baptist Book Store advertises that it carries a wide assortment of Bibles, *general* and religious books, children's books,

*Sunday School Board of the Southern Baptist Convention v. McCue,* 179 Kan. 1, 3–4, 293 P.2d 234, 236 (1956); *Berean Fundamental Church Council, Inc. v. Board of Equalization,* 186 Neb. 431, 432, 183 N.W.2d 750, 751 (1971). Its sales, for the most part, are made at competitive retail prices. There is no indication that merchandise is provided to anyone at or below its cost to the bookstore. *Compare Franciscan,* 566 S.W.2d at 225; *Salvation Army,* 354 Mo. at 114, 188 S.W.2d at 830. In short, the Baptist Book Store's operation is similar to that of other retail bookstores.

In addition, it is less than clear that the Baptist Book Store is operated entirely on a not-for-profit basis. It did lose money in 1978 and 1979. Yet in 1980 and 1981, the years for which exemption is sought here, it was profitable. After payment of its local operating expenses and its proportioned share of the Bookstore Division's central administrative expenses, the Baptist Book Store earned $8,675 in 1980 and $8,709 in 1981. Those profits are not substantial, but they are profits.

Whether an asserted charity earns or loses money is not, of itself, dispositive. The Court pointed out in *Franciscan* that it is not "impermissible for the project at times or even fairly regularly to operate in the black rather than on a deficit basis." 566 S.W.2d at 224. Any gain, however, must be "achieved incidentally to accomplishment of the dominantly charitable objective" and must be "devoted to attainment of the charitable objectives of the project." *Id.* In this case the profits earned by the Baptist Book Store in 1980 and 1981 were paid over to respondent to help defray the general and administrative expenses of respondent's overall enterprise. That overall enterprise comprises much more than just the book-

store operation.[4] We therefore cannot say that profit "is not a primary goal of the project" or that the profits earned were "achieved incidentally." *Id.* We agree with the Kansas Supreme Court, which considered a similar Baptist Book Store in Wichita, that "the most that can be said is that [respondent] is conducting a mercantile institution . . . and that the profits derived therefrom are being used for religious purposes." *McCue,* 179 Kan. at 7, 293 P.2d at 238.

█ It is not enough, however, that the profits are ultimately used for religious or charitable purposes. "[A]n exemption will not be granted covering property which houses a business operated for the purpose of gaining a profit, even though it is turned over to a parent organization to be used for what are admittedly independently religious or charitable purposes." *Franciscan,* 566 S.W.2d at 224. Otherwise the exception could swallow the general rule if the profits from any enterprise, be it charitable or not, were ultimately used for charitable purposes. There must be a more significant nexus between profits earned through use of the property for which an exemption is sought and the use that is made of those profits. A business cannot compete for profit and then seek to insulate itself from taxation by claiming that its profits are used to attain a religious or charitable purpose. The

> policy of exemption of religious institutions, established when they were struggling to get along, has enabled them . . . to acquire large real estate holdings and to accumulate great wealth; and many of them are engaged in operating various kinds of secular businesses tax-free, in competition with other like businesses that are taxed. This development creates

devotional and teaching helps, commentaries, music, recordings, visual aids, and church supplies. Southwestern Bell Telephone Co., *Greater Kansas City Yellow Pages* 219 (1983) (col. 1).

4. Respondent also publishes denominational and general Christian literature and provides a number of other special services, including films, music, vocational guidance, library and recreational services, and architectural advice. *Book Agents of the Methodist Episcopal Church, South v. State Bd. of Equalization,* 513 S.W.2d 514, 525 (Tenn.1974). Not all aspects of respondent's enterprise are exempt from taxation under the law of Tennessee, respondent's principal place of business. *See id.* at 524–25.

inequities and endangers both the churches and the state.

*City of Nashville v. State Board of Equalization,* 210 Tenn. 587, 611–12, 360 S.W.2d 458, 469 (1962). Competition purely incidental to effectuation of a charitable purpose does not affect the charitable nature of the enterprise, *see Goodwill,* 357 Mo. at 652, 210 S.W.2d at 41, but competition for profit is inimical to the charitable use of the property.

We are compelled to conclude that respondent has not sustained its "substantial burden," *Missouri Church of Scientology,* 560 S.W.2d at 844, of proving that its property falls within the class of property entitled to a charitable exemption. Respondent's property therefore is not exempt from taxation, and the judgment of the trial court must be reversed. This decision is in accord with the decisions of other courts that have considered claimed tax exemptions for religious bookstores. *E.g., McCue,* 179 Kan. at 6–8, 293 P.2d at 238–39; *Supervisor of Assessments v. Peter & John Radio Fellowship, Inc.,* 274 Md. 353, 364–67, 335 A.2d 93, 99–100 (1975); *Berean Fundamental Church Council,* 186 Neb. at 435, 183 N.W.2d at 753; *Lutheran Book Shop v. Bowers,* 164 Ohio St. 359, 359–62, 131 N.E.2d 219, 219–21 (1955); *Board of Publication of the Methodist Church v. State Tax Commission,* 239 Or. 65, 67–70, 396 P.2d 212, 213–14 (1964); *Multnomah School of the Bible v. Multnomah County,* 218 Or. 19, 42, 343 P.2d 893, 904 (1959); *American Sunday-School Union v. Taylor,* 161 Pa. 307, 313–17, 29 A. 26, 27–28 (1894); *Book Agents of the Methodist Episcopal Church, South v. State Board of Equalization,* 513 S.W.2d 514, 525 (Tenn.1974).[5]

The judgment is reversed.

5. Three of these cases are of particular significance here. As noted above, *McCue* involved a similar Baptist Book Store operated by respondent in Wichita, Kansas. *Book Agents* dealt with property owned by respondent in Nashville. The Tennessee Supreme Court noted that "[b]ookstores of these publishing companies [operated by respondent] are non-exempt and administrative and warehouse areas which serve as the headquarters for such stores are likewise non-exempt." *Book Agents,* 513

HIGGINS, GUNN, BILLINGS, BLACKMAR and DONNELLY, JJ., concur.

RENDLEN, C.J., dissents in separate opinion filed.

RENDLEN, Chief Justice, dissenting.

I respectfully dissent to the majority's finding that the Baptist Book Store does not operate for purposes purely charitable, within the meaning of § 137.100(5), RSMo 1978, and to the majority's ruling that the Book Store's property, both real and personal, is therefore subject to ad valorem property taxes.

Stripping the stated purposes of the Sunday School Board to their bare essentials, the organization was created to support the Southern Baptist Convention in "bringing men to God" by making available reading material, music, and audio-visuals, and by fostering Christian education, Sunday schools and service programs as an auxiliary to the Convention's churches. The operation of the Baptist Book Store helps fulfill these goals by selling religious materials to churches and Sunday schools (such transactions comprise at least two-thirds of the store's sales), and by expanding the Baptist ministry beyond the hearing range of the pulpit. Sales to the general public provide a distribution outlet not only to those who are already church members and who may wish to supplement the message and inspiration derived from Sunday worship but also to those unable to attend church services. Additionally, providing readily accessible materials to the general public allows the Baptist Convention to reach beyond its present membership and fulfill its proselytizing function. The operation comports with the charitable use of property claimed

S.W.2d at 525. In *American Sunday-School Union* a religious society that operated a bookstore at which it sold religious literature and some secular works for a profit was denied exemption. That holding, this Court later said, "accords with the case law in Missouri." *Evangelical Lutheran Synod v. Hoehn,* 355 Mo. 257, 271, 196 S.W.2d 134, 145 (1946), *overruled on other grounds, Barnes Hosp. v. Leggett,* 589 S.W.2d 241, 243 (Mo. banc 1979).

by the organization. The majority correctly states the long-held rule that the *use* of property determines tax-exempt status and that the nature of the organization owning the property is significant only insofar as the organization must be not-for-profit. *Franciscan Tertiary Province v. State Tax Commission,* 566 S.W.2d 213, 223 (Mo. banc 1978); *City of St. Louis v. State Tax Commission,* 524 S.W.2d 839, 844 (Mo. banc 1975); *YMCA v. Sestric,* 362 Mo. 551, 242 S.W.2d 497, 505 (1951); *Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826, 828 and 830 (1954), *citing State ex rel. Spillers v. Johnston,* 214 Mo. 656, 633, 113 S.W. 1083, 1085, 21 L.R.A., N.S., 171 (Mo.1908). However, the majority charges that several factors tarnish the characterization of the Book Store's use of its property as charitable, namely:

First, the Book Store "sells to all members of the general public as well as to churches and Sunday schools";

Second, the materials sold are "not purely denominational";

Third, "Something less than half of the items the Baptist Book Store sells are also carried by commercial retailers";

Fourth, the Book Store charges "competitive retail prices" rather than providing its merchandise "at or below its cost to the bookstore";

Fifth, the Book Store is not "operated entirely on a not-for-profit basis."

I cannot agree that these factors individually or in combination destroy the characterization of this property as dominantly charitable; hence, I believe this record justifies preserving the tax exemption respondent previously enjoyed.

An analysis of the above-referenced factors demonstrates the dominantly charitable nature of the Book Store property, real and personal. Concerning the majority's first point of attack, sales to the general public (as previously noted) facilitate the Sunday School Board's efforts of disseminating its religious messages to the public and of broadening the Southern Baptist Convention's membership. These materials are made available to a wider and more diverse audience than it is able to reach directly on Sundays; it is able to offer these throughout the week rather than once weekly.

As to the second factor, the majority inappropriately attacks the Book Store's charitable use of this property on the ground that the materials the store sells are not purely denominational. As respondent stated in oral argument, the Baptist religion shares many beliefs with other Christian faiths (and, I would venture to say, even with many non-Christian faiths); what is important to recognize is that the materials sold are religious in nature and that they do not *conflict* with the tenets of the Baptist church but are in line with the church's teachings. The sale of these materials, therefore, do not denigrate the charitable nature of the use of this property.

In response to the majority's third point of criticism, although it may be possible to buy at commercial retail stores a number of *items* sold at the Book Store, the fact remains that two-thirds of all of the Book Store's *sales* are to churches and Sunday schools. The implication is not that the books and other items are of a secular or non-religious nature but that by being sold in commercial stores, they have commercial value despite their religious appeal. The only reference in the majority opinion to the sale of non-religious books concerns a Yellow Pages advertisement indicating that in addition to selling religious materials, the Book Store also engages in the sale of "general books." It is not clear from the record that these books are of such a non-religious, non-inspirational, nor non-charitable nature that would indicate that they do not further the charitable goals of the Book Store and of the Southern Baptist Convention. Nor is it clear that even some secular books are not meaningfully tangential to the Convention's non-secular goals. Furthermore, it is not clear that these "general books" represent more than a *de minimis* portion of the Book Store's sales. Finally, the parties had stipulated at trial that the Book Store's inventory consisted of "religious literature and supplies," but made no reference to

non-religious books. Since this point was not argued at the trial or appellate level and is not otherwise supported in the record, it appears inappropriate for the majority opinion to *sua sponte* suggest the point is made on the basis of a Yellow Pages advertisement. While this Court, during oral argument, inquired about the Book Store's sale of art supplies to the public, respondent explained that the record indicates that the purpose of offering those supplies for sale was to benefit Sunday school teachers and children by augmenting the religious material available to them. Respondent's analogy at oral argument to *Missouri Goodwill Industries v. Gruner,* 357 Mo. 647, 210 S.W.2d 38 (1948), is well-taken: in *Gruner,* the purchase of Goodwill products by persons having no interest in aiding the handicapped was not fatal to Goodwill's charitable nature, *id.* at 41; likewise, as respondent analogized, the fact that members of the general public purchase some of these art supplies for non-religious purposes should not be the source of an attack on the status of the real estate as being charitable in nature.

Finally, as to the majority's fourth and fifth criteria, I cannot agree with the majority's implication that this religious bookstore is competing for profits and therefore cannot claim tax-exempt status. It is difficult to imagine that a bookstore which confines itself to selling bibles and religious and incidentally "general books" is competing for profit in the traditional sense of the word. The parties stipulated at trial that less than half the religious books and supplies carried by this store are also carried by some commercial retailers. Moreover, only one-third of all sales are to persons or organizations other than churches and Sunday schools. Rather than evidencing a commercial enterprise whose primary purpose is profit, these facts indicate that the raison d'être of the Book Store is to spread religious messages that the Sunday School Board deems consonant with the tenets of the Southern Baptist Convention. And although some sales may be made to members of the general public, sales of principally religious materials serve as an effective means of furthering the religious goals of the Convention. To compare prices charged by the Book Store with prices found in commercial retail stores offers little in determining respondent's exempt status. Common sense suggests that religious books are not bestsellers; a general awareness of manufacturing processes suggests that the smaller the number of units manufactured, the higher will be the per-unit manufacturing cost. Hence, a retailer must pay the publisher a higher price if the publisher is to recoup his costs, and the retailer must pass this cost to the consumer or incur a loss. Thus, there are very practical reasons that the prices of these books are at levels similar to commercial books; therefore, the prices that the Book Store charges simply do not bear on the issue at bar.

If the majority's position is that the prices are competitive item for item—that is, that a buyer of any given book will pay the same price or less at the Baptist Book Store than he would for the same book at any other store, then that position is also defective. Ironically, if respondent could achieve tax-exempt status by lowering its prices or by giving away its materials (as the majority suggest), competition would be altered if not destroyed—consumers would have no incentive to purchase books at commercial stores when they could get the same item for less or for free from the Baptist Book Store. In addition, as this Court noted in *Gruner,* 210 S.W.2d at 41, some competition with sellers of similar goods is not fatal to tax-exempt status, and as the Court held there, I do not regard the negligible "competition" here as a serious menace to trade; hence, I would preserve the Book Store's tax exemption.

Related to the notion of competition is the majority's insistence that the Book Store operates at a profit. This it finds by deleting from respondent's costs a deduction for the Book Store's general and administrative expenses, which are incurred from services provided by the parent Sunday School Board in Nashville. These include such things as accounting and payroll services, which, as respondent indicated in

oral argument, must necessarily be provided locally if not by the Board. Accordingly, it is appropriate that this item should be considered as a deduction in the Book Store's profit and loss statement, and from this it is clear that the Book Store did not operate at a profit in 1980 or 1981.

Assuming *arguendo* that the store did operate at a profit during those years, this fact alone should not deprive respondent of an exemption as a charity. In *YMCA v. Sestric,* 362 Mo. 551, 242 S.W.2d 497 (Mo. banc 1951), an exemption was granted even though YMCA residence halls showed an excess of income over expenses in two of three years for which tax assessments were under attack. "Whether a particular facility made a profit or suffered a loss for any particular year, the fact of such profit or loss ... would simply be evidence ... on the proposition of whether the purpose of the use was to make a profit." *Id.,* 242 S.W.2d 497 at 506. *See also Community Memorial Hospital v. City of Moberly,* 422 S.W.2d 290 (Mo.1967) (large income from paying patients did not jeopardize hospital's charitable status because its purpose was not to make profits but to devote any income from its operation to its patients, whether or not they could pay). The majority accepts the holding in *Franciscan Tertiary Province of Missouri v. State Tax Commission,* 566 S.W.2d 213, 224 (Mo. banc 1978), that it is not impermissible

> for the project at times or even fairly regularly to operate in the black ... provided, of course, that any income over expenses is achieved incidentally to the accomplishment of the dominantly charitable objective and is not a primary goal of the project, and provided further that all such gain is devoted to the charitable objectives of the project.

"Profit incidental to a dominantly charitable objective" is the shibboleth of cases dealing with charitable exemptions. The majority concedes the Book Store sustained losses in 1978 and 1979; furthermore, they admit that the "profits" earned in 1980 and 1981 are not substantial. These facts suggest that the Book Store does not have profit-making as a primary objective, but rather that it has earned profit only incidentally in pursuing its dominantly charitable purpose. This distinguishes the case before us from *Evangelical Lutheran Synod v. Hoehn,* 355 Mo. 257, 196 S.W.3d 134 (Mo. 1946), on which appellant (and to a lesser extent, the majority) relies. In *Evangelical,* this Court denied a tax exemption for the property on which the Concordia Publishing House operated. Factually, *Evangelical* is quite distinct from the case before us, although there is some resemblance in that Concordia was a publisher primarily of religious books and in that it turned over much of its profits to the Lutheran Synod. However, the real property questioned there consisted of eighteen lots, on which were six buildings that Concordia used for its operations. Net assets were valued *in 1944* at $1,332,290.30, and these produced net income of $225,889.89, representing a 17% return on assets; Concordia turned over $125,000 to the Synod that year. *Id.* at 138. This Court found that Concordia was "competitive and [was] run like any other similar business," *id.* at 144, and that "its profits have been used for extension of its properties, or paid to or held for the Synod." *Id.* at 138. The Baptist Book Store's assets and income are but a miniscule fraction of Concordia's, and are not used for the extension of its properties.

More importantly, it must be noted that *Evangelical* was decided in light of an 1875 Constitutional provision prohibiting religious corporations from owning real estate other than for " 'church edifices, parsonages, and cemeteries.' " *Id.* at 140, *citing* Mo. Const. Art. II, § 8 (1875). Although this provision was eliminated from the 1945 Constitution, the case was decided under the earlier provision. 196 S.W.2d at 140–141. Because Concordia's buildings did not fit into any of the three classifications of the Constitutional exemptions then in vogue, the Court found that the appellant taxpayers could not hold title to the lots and buildings and therefore could not claim the property as tax exempt. But the appellants in that case further argued that the Synod was both a religious organization *and*

a charitable one, and therefore endeavored to persuade the Court to grant it an exemption as a charitable corporation so as to evade the constitutional prohibition against a religious organization's ownership of property. The Court held that the Synod could not subvert the constitutional provision by creating the publishing house as a subsidiary to hold title to land not used for the approved purposes. *Id.* at 142.

The Court then focused on, Mo. Const. Art. X, § 6 (1875) which exempted from real property taxes lots of one acre or less and buildings thereon when used "exclusively for religious worship, for schools, or for purposes purely charitable . . . ." After re-emphasizing that the publishing house was competitive and operated like any other similar business, and after re-emphasizing the 17% return that Concordia earned in 1944, the Court indicated that even though Concordia's earnings were destined to go to the parent Synod, Concordia could not be classified as a charitable organization on that basis alone. *Id.* at 144. In sum, the Court ruled that tax-exempt land must be used exclusively for religious worship or for purposes purely charitable, but held that a "competitive commercial business operated for a profit does not comply with that requirement, even though the profits are devoted to religion." *Id.* at 147; *see also Franciscan Tertiary Province of Mo., Inc. v. State Tax Commission,* 566 S.W.2d 213, 224 (Mo. banc 1978). Thus, Concordia could not be classified as a charitable organization simply because it donated substantial portions of its profits to its parent, a religious organization. A business organized for profit "cannot secure an exemption from taxation as a charitable institution merely because, as an incident to its operation, it administers a charity." 71 Am.Jur.2d State and Local Taxation, § 363.

The *Evangelical* ruling does not require a religious bookstore to be classified as a non-charitable organization—it merely holds that an organization cannot achieve charitable status simply by donating profits to a religious group. Unlike Concordia, whose primary purpose was to generate profit, the Baptist Book Store serves to further the

goals of the Southern Baptist Convention; the "profits" that the majority claims the Book Store has earned are merely incidental to the Book Store's charitable goals. Although an exempt status is not available to businesses such as Concordia whose claims for such status rest simply on turning over profits to a parent organization to be used for "independently charitable purposes," *Franciscan,* 566 S.W.2d at 224, the "profits" that the Book Store has relinquished to the Sunday School Board are completely distinguishable and are payment for services rendered, which should be added to the cost of operations in determining whether or not profit was actually earned.

*YMCA v. Sestric,* 362 Mo. 551, 242 S.W.2d 497 (Mo. banc 1951), also cited by the majority, focused not only on profits but on the *use* made of the property being assessed. *See also Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826, 828 (Mo.1945), 84 C.J.S. Taxation § 282, *and* 71 Am.Jur.2d State and Local Taxation, § 365, *citing St. Louis YMCA v. Gehner,* 329 Mo. 1007, 47 S.W.2d 776 (Mo. banc 1932). The Court in *Sestric* approved exemption where the uses of the property were intimately connected with the accomplishment of the organization's purely charitable goals, with the qualification that the uses themselves did not have profit as their primary purpose. *Id.,* 242 S.W.2d at 505. The Court distinguished between this kind of use and the one in which the primary purpose for using the property is to make a profit, even though the profit is made for the express purpose of furthering a purely religious goal. *Id.* This reasoning was repeated in *Franciscan, supra,* 566 S.W.2d at 223, which held that use of the property lies at the heart of the exemption, not the general nature of a parent entity that utilizes a commercial enterprise for support. In the case before us, the Baptist Book Store's function is to spread the religious tenets of the Southern Baptist Convention. It bears continued reemphasis. Its primary purpose is not to make a profit but to supply religious reading and audiovisual materials to churches, Sunday schools, and the general public.

As the majority has acknowledged, statutes granting exemptions are to be strictly

*but reasonably* construed against the party claiming them. A reasonable construction, however, is one that does not " 'curtail the intended scope of the exemption . . . .' " *Missouri United Methodist Retirement Homes, Inc. v. State Tax Commission,* 522 S.W.2d 745, 751 (Mo.1975), *citing YMCA v. Sestric,* 362 Mo. 551, 242 S.W.2d 497, 502 (Mo. banc 1951). Furthermore, the Court in *United Methodist* added that the taxing authorities are not permitted to defeat the stated public policy of exempting charitable property "by unreasonable or unrealistic application of the 'strict construction' rule." 552 S.W.2d at 751. To exclude respondent from tax-exempt status on the basis that use of its property is not purely charitable erodes the public policy of § 137.100(5). A profit earned incidental to the sale of religious books and materials that promote the basic charitable purpose of the organization should not subject respondent to taxation. We should follow *St. John's Medical Center v. Spradling,* 510 S.W.2d 417, 419 (Mo.1974), in repudiating those cases that give only an unacceptably narrow construction to the charitable exemption statute.

I am in agreement with the Circuit Court and would affirm its judgment.

As an addendum, I note that the majority has failed to take cognizance of our recent decision in *Barnes Hospital v. Leggett,* 589 S.W.2d 241 (Mo. banc 1979), in which this Court overruled a long line of cases that had held the charitable nature of property to be tainted *in toto* if only a fraction of the property was used for non-charitable purposes. The Court in *Barnes* established "a new sense of direction" by granting proportional exemptions where property is used partly for profit and partly for charitable purposes. *Id.* at 243, *expressly overruling Wyman v. City of St. Louis,* 17 Mo. 335 (1852); *State ex rel. Spillers v. Johnston,* 214 Mo. 656, 113 S.W. 1083 (Mo.1908); *Evangelical Lutheran Synod v. Hoehn,* 355 Mo. 257, 196 S.W.2d 134 (Mo.1946); *St. John's Mercy Hospital v. Leachman,* 552 S.W.2d 723 (Mo. banc 1977). In so doing, the *Barnes* Court held that

> Mo. Const. Art. X, § 6 and § 137.100, RSMo 1978, which exempt from taxation

property "used exclusively * * * for purposes purely charitable," authorize a partial exemption of a building or tract, where that building, or tract, is used in part for charitable purposes and in part for non-charitable purposes.

*Id.* at 244. In my view, the use of the Baptist Book Store's property is wholly charitable; to hold otherwise erroneously overrides the trial court and does not comport with the facts. However, if the majority persists in classifying the use of this property as only partially charitable and in determining that only two-thirds of the materials sold are religious, then they must take *Barnes* into account unless that case is intended to be overruled *sub silencio.* Proceeding in the "new direction" prescribed in *Barnes,* it is clear that apportionment is required when a charitable organization uses property for dual purposes, charitable and non-charitable. It is also clear from *Barnes* that a fractional non-charitable use may restrict an exemption, but does not obliterate it. Thus I would affirm the judgment or at the very least remand this cause to the Circuit Court for a determination of what percentage of the property should be taxable and what portion should remain tax-exempt under the teachings of *Barnes.*