**Jean TWITTY, Assessor for the County of Greene, State of Missouri, Plaintiff–Appellant,**

v.

**STATE TAX COMMISSION OF MISSOURI, Defendant–Respondent,**

and

**Family Medicine of the Ozarks, Inc., Defendant–Respondent–Intervenor.**

**No. 19548.**

Missouri Court of Appeals, Southern District, Division One.

March 29, 1995.

Theodore L. Johnson, III, County Counselor, Glenn P. Green, Asst. County Counselor, Greene County, Springfield, for plaintiff-appellant.

Frank M. Evans, III, Cynthia B. McGinnis, Miller & Sanford, Springfield, for defendant-respondent-intervenor.

SHRUM, Chief Judge.

■ We must decide whether the State Tax Commission of Missouri (the Commission) erred when it found that real estate owned by Family Medicine of the Ozarks, Inc. (FMO), was being used for charitable purposes and was thus exempt from ad valorem taxes. Appellant, Jean Twitty (Assessor), urges that we reverse, saying FMO failed to show that (1) it used the property consistent with the charitable purposes set forth in its articles of incorporation, and (b) profit was the primary goal of the activity conducted on the subject property.

We agree with Assessor and reverse.[1]

### FACTS

Family Medicine of the Ozarks, Inc. (FMO), was incorporated in October 1990 under Missouri's "General Not for Profit Corporation Law," § 355.010, *et seq.*, RSMo 1986. It is a wholly owned subsidiary of St. John's Regional Health Center of Springfield, Missouri (St. John's).

In amended articles of incorporation filed in December 1991, FMO recites its general purposes to be "charitable, educational, religious, or scientific." Specific purposes listed include:

"[A] [T]o qualify ... as an organization exempt from federal income tax ...; [B]

---

1. Because we agree with Assessor on these points, we need not consider whether other reasons exist for reversing the Commission.

to establish a primary care network to assist in assuring the provision of adequate medical care in Southwest and South Central Missouri and Northwest Arkansas through, among other methods, contracting with and employing medical doctors and related personnel and the purchase, construction and maintenance of adequate physical facilities throughout rural Southwest and South Central Missouri and Northwest Arkansas to be used in the provision of adequate medical care in these areas; [C] to develop efficient and practical arrangements for providing high quality primary care and related health services to underserved areas in Southwest and South Central Missouri and Northwest Arkansas...." [2]

After its incorporation, FMO obtained a letter ruling from the Internal Revenue Service exempting it from federal income tax. It also obtained a Missouri sales tax exemption.

In April 1992, St. John's conveyed to FMO certain real estate at 2754 West Republic Road, Springfield, Missouri. The property is immediately southwest of Springfield, Missouri, and is in a neighborhood considered a "growing" residential area. The name given the subject property was the Southwest Medical Clinic (SMC). Assessor assigned the property a parcel number and assessed it at $80,770.

In June 1991, FMO asked the Greene County Board of Equalization to exempt the SMC property from taxation based on its alleged use for charitable purposes. When that request was denied, FMO filed a complaint with the Commission asking that it adjudge the real estate exempt. After evidence was adduced, a hearing officer ruled that the subject property met the statutory test for exemption. He set aside the valuation of the property and ordered the county clerk to enroll the property on the list of exempt property. The Commission denied Assessor's application for review saying, "the hearing officer decision stands as written."

On appeal to the Greene County Circuit Court, it affirmed the Commission's decision. This appeal followed.

Most of the evidence adduced before the hearing officer came via testimony of George Flynn and exhibits he identified.

George Flynn is a vice-president of St. John's who also sits on the board and serves as secretary of FMO. He described St. John's service area as an eighteen-county area in southwest and south central Missouri and northwest Arkansas.[3]

A 1992 Missouri Department of Health publication in evidence identified eleven of the eighteen counties as having some level of physician manpower shortage.

Flynn testified that the original purpose of FMO was to retain or otherwise attract "quality primary care physicians" to any area where there was a shortage of family practitioners, but especially to rural areas of southwestern and south central Missouri and northwestern Arkansas where there were inadequate numbers of family practice physicians. FMO was to meet that goal by either buying or building medical clinics and staffing them with new physicians hired by FMO. Flynn testified that the "specific problems ... that St. John's felt would be remedied by ... FMO ... [was] access to care." Continuing, he explained:

"Because physicians were leaving the area. That, especially in the rural areas, resulted in problems of access to care, people having to drive 50, 60 miles to receive care.... There needed to be physicians to replace those retiring physicians. Those were the main problems we identified."

At the time of the hearing, FMO had clinics in five of the counties designated as physician manpower shortage areas. However, the SMC property was "not located in a primary care health professional shortage area as identified by the Missouri Department of Health." Nonetheless, Flynn testi-

2. The writer has added the paragraph designations [A], [B], and [C] for ease of reference elsewhere in the opinion.

3. Flynn's definition of St. John's service area was that eighty percent of the people who utilized St. John's lived within the eighteen-county area.

fied that the SMC real estate served FMO's overall purpose of FMO in two ways.

"Number one, even though Greene County is not as a countywide listed as a primary care shortage area the most of the physicians ... located in Greene County are ... around the health centers that are ... in the city. This is a neighborhood clinic. In that neighborhood there are no physicians ... so in that regard ... [i]t is serving an area of population that doesn't have convenient access to care.

Number two, what it allows us to do is to help spread resources amongst from one clinic amongst several. So, maybe the clinic in Greene County that where it can be financially viable can help offset some of these other small rural areas where it really isn't going to be viable to maintain a clinic.

But, by FMO, instead of each clinic being on its own by having one organization those resources can be moved around the organization to help support other clinics that may otherwise not be able to function."

On cross-examination, Flynn was asked about a "statement of purpose" narrative prepared by FMO to accompany its application filed with Assessor:

"Q. [Assessor's counsel] Would I be fair in describing this narrative of FMO as dealing with rural problems as contrasted to problems of the urban areas such as Springfield?

A. [by Flynn] Yes.

Q. Nevertheless, the clinic in question is in Springfield?

A. And, it contributes to the overall mission of [FMO].

Q. By paying its way and maybe paying the pay [sic] of someplace [sic] else?

A. Helping to offset to spread the resources."

When asked how FMO's operation of the SMC property differed from privately owned clinics, Flynn answered:

"[T]his Southwest Medical [Clinic] is a component of [FMO] which is a large network of physician clinics. The second way is that any excess revenues from this clinic are put back into the operations and used across the system, not into an individual's own income. Whereas the normal physician, money comes in, he pays the bills, whatever is left over is his personal income. In this situation the physicians are paid a salary and then any excess revenues can go to support other clinics or future growth and recruitment of new physicians."

Flynn also testified that part of Greene County was listed in the shortage area—although not the part where the SMC property was located—and that SMC did not limit its patients to those who live in Springfield. Moreover, the same level of medical care is provided to all patients who come to SMC without regard to whether they are indigent, insured, noninsured, or have other means to pay.

The evidence was that FMO lost money in its total operations for the 12–month period ending June 30, 1992. Separate records on the SMC clinic revealed that it too had lost money thus far. Flynn explained that presently St. John's "makes up that cash shortage." He also testified that "FMO's goal in operating [SMC] from a financial standpoint" was for the "short term ... break even and then longer term ... see it generate enough excess revenue over expenses to fund future equipment needs, expansion, recruitment of new physicians both ... in this clinic or in any other clinic that is needed."

Based on the record made, the hearing officer concluded that the subject property (1) was actually and regularly used exclusively for a charitable purpose, (2) was owned and operated on a not-for-profit basis, and (3) had as its dominate use the benefit of an indefinite number of people. He concluded that the SMC property met the statutory test for exemption. It is that decision which Assessor challenges on appeal.

### STATUTORY PROVISIONS, LEGAL PRINCIPLES, AND SCOPE OF REVIEW

■ Section 137.100, RSMo 1986, is the statutory provision that permits certain prop-

erty to be exempt from taxation. The pertinent part of § 137.100 reads:

"The following subjects are exempt from taxation for state, county or local purposes:

. . . .

5. All property, real and personal, actually and regularly used exclusively for ... purposes purely charitable and not held for private or corporate profit, except that the exemption herein granted does not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom is used wholly for ... charitable purposes...."

Our supreme court has identified a three-pronged test to be applied in determining whether property is exempt under the "for purposes purely charitable" provision of § 137.100(5). *See Franciscan Tertiary Prov. v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc 1978).

"First, the property must be 'owned and operated on a not-for-profit basis' so that there can be 'no profit, presently or prospectively, to individuals or corporations.' [*Franciscan,* 566 S.W.2d] at 224. The property need not always be operated at a deficit, but any profit must be 'achieved incidentally to accomplishment of the dominately charitable objective' and may not be 'a primary goal of the project.'

Second, the property 'must be dedicated unconditionally to the charitable activity.' *Franciscan,* 566 S.W.2d at 224. This requirement stems from the statutory mandate that the property be 'used exclusively' for charitable purposes, § 137.100(5), within the *Salvation Army [v. Hoehn,* 354 Mo. 107] [188 S.W.2d 826 (1945)] definition of charity, *see Barnes Hospital v. Leggett,* 589 S.W.2d 241, 244 (Mo. banc 1979). Third, 'the dominate use of the property must be for the benefit of an indefinite number of people,' and there must also be 'direct or indirect benefit to society in addition to and as a result of the benefit conferred on the persons directly served by the humanitarian activity.'

. . . .

The [*Franciscan*] Court thus made it clear that the language of the charitable exemption provisions 'makes the use of the property the focus of the exemption' and that the 'general nature of the owning organization—other than it is not-for-profit—cannot be said to determine whether the use of the particular property is charitable or not.' *Franciscan,* 566 S.W.2d at 223."

*Sunday School Board of the Southern Baptist Convention v. Mitchell,* 658 S.W.2d 1, 5[6] (Mo. banc 1983) (citations omitted). All three prongs of the test must be met in order for property to be exempt. *Rolla Apartments v. State Tax Commission,* 797 S.W.2d 781, 784 (Mo.App.1990).

■ In considering a claim for exemption under § 137.100, appellate courts follow these principles:

"[T]axation of property is the rule, and exemption is the exception to this rule. *Mo. Church of Scientology v. State Tax Comm'n.,* 560 S.W.2d 837, 844 (Mo. banc 1978). The law disfavors claims for exemption from taxation. *Id.* The substantial burden of establishing the property falls within the exempted class is on the person claiming exemptions under the referenced constitutional and statutory provisions. *City of St. Louis v. State Tax Comm'n.,* 524 S.W.2d 839, 843 (Mo. banc 1975). To prevent the curtailing of the purpose and intended scope of a tax exemption, the exemption statute is to be strictly but reasonably construed. *Id.* at 843–44."

*Affiliated Medical Transport v. State Tax Commission,* 755 S.W.2d 646, 649 (Mo.App. 1988).

■ Finally, we observe that appellate review is directed to the findings and decision of the Commission. *City of Cabool v. Mo. State Board of Mediation,* 689 S.W.2d 51, 53 (Mo. banc 1985); *Rolla Apartments,* 797 S.W.2d at 784. When the issue presented for review is the application of a law or legal standard, i.e., the application of § 137.100(5) for purposes of determining whether the real estate is exempt from taxation, the reviewing court may independently weigh the evidence and resolve factual issues. *Bergman v.*

*Board of Trustees of Firemen's Retirement System of St. Louis,* 425 S.W.2d 143, 147 (Mo.1968); *Rolla Apartments,* 797 S.W.2d at 791; § 536.140.3, RSMo 1986.[4] However, in applying that standard of review, appellate courts give due weight to the opportunity of the Commission to observe the witnesses and to the Commission's expertness and experience. *Rolla Apartments,* 797 S.W.2d at 791.

### DISCUSSION AND DECISION

In Point II A(1), Assessor contends that the Commission erred in exempting the SMC property from taxation because FMO's use of that property was not consistent with its corporate purposes. She argues that FMO's articles of incorporation restrict it to providing medical care in "rural and underserved areas" of southwest and south central Missouri and northwest Arkansas. Assessor says that when FMO's charitable purpose is thus viewed, the subject property cannot directly meet FMO's dominate charitable objective because it is not in a "rural" or "underserved" area. In support, Assessor points to undisputed evidence that the SMC property is immediately southwest of Springfield, Missouri, at a location admitted by FMO not to be within "a primary care health professional shortage area." She summarizes this point as follows:

"FMO failed to demonstrate that the subject property *directly* remedies the problem of availability of adequate medical care in rural areas experiencing shortages of primary care or family practice physicians. Missouri law is clear that when the property is used to *indirectly* address the corporation's charitable goals and is actually utilized to generate excess revenues to fund those goals, there is no entitlement to exemption from taxation. Since the primary purpose of the subject property is not to serve a rural area, or an underserved area, this Court must find that the Tax Commission erred in finding the use of the subject property by FMO to be consis-

tent with the charitable purposes set forth in its Articles of Incorporation."

In Point II B, Assessor contends that *if* the activity on the SMC property is inconsistent with FMO's corporate purposes as she says in Point II A(1), the only role that remains for the SMC project is generating income for FMO. Continuing with that argument, Assessor asserts that the facts compel a finding that "profit" was the primary goal for the SMC property and, consequently, the subject property fails the incidental profit test and cannot be exempt from taxation. As authority for Point II B, Assessor cites *Sunday School,* 658 S.W.2d at 5; *Defender's Townhouse, Inc. v. Kansas City,* 441 S.W.2d 365, 369 (Mo.1969); and *Tri–State Osteopathic Hospital v. Blakeley,* 848 S.W.2d 571, 576 (Mo.App.1993).

In response, FMO argues that the corporate purposes of FMO are broader than that suggested by Assessor. Specifically, FMO points to language in the purposes clause of its articles of incorporation that reads: "The corporation shall be organized ... to establish a *primary care network* [of clinics] to assist in assuring the provision of adequate medical care in Southwest and South Central Missouri and Northwest Arkansas...." Focusing on that language, FMO asserts that the activity on the SMC property is consistent with its corporate purpose because (1) the subject property is used as a medical clinic, (2) future excess revenues anticipated from the operation of this clinic will be put back into the operation of FMO's other clinics, (3) patient services are offered to all patients without regard to where they may live, and (4) the same medical care is provided at this clinic to both insured and uninsured patients.

■ Resolution of the issues presented by Points II A(1) and II B depends upon the construction of the purposes clause of FMO's articles of incorporation. The rules and principles that govern the interpretation of stat-

---

4. § 536.140.3 reads, in part: "3. Whenever the action of the agency being reviewed does not involve the exercise by the agency of administrative discretion in the light of the facts, but involves only the application by the agency of the law to the facts, the court may weigh the evi-

dence for itself and determine the facts accordingly.... In making such determination the court shall give due weight to the opportunity of the agency to observe the witnesses, and to the expertness and experience of the particular agency."

utes and contracts apply also to the interpretation of corporate charters and articles of incorporation. *Missouri State Teachers Ass'n v. St. Louis Suburban Teachers Ass'n,* 622 S.W.2d 745, 749 (Mo.App.1981). When the language of a corporate charter or articles of incorporation is clear and unambiguous, it does not require construction by a court. *Sundlun v. Executive Jet Aviation, Inc.,* 273 A.2d 282, 285 (Del.1970). But, if the meaning of the words used are not plain and unambiguous, the language used should be read considering the circumstances, the ends to be accomplished, the interpretation placed upon the language by the parties themselves, and other evidence bearing on the question of its meaning. *Missouri State Teachers Ass'n,* 622 S.W.2d at 749 (citing *State ex rel. Zoological Park Subdistrict, St. Louis v. Jordan,* 521 S.W.2d 369, 372 (Mo. 1975), and *Sundlun,* 273 A.2d at 285). *See also E.O. Dorsch Electric Co. v. Plaza Construction Co.,* 413 S.W.2d 167, 173 (Mo.1967).

■ The critical phrase in the purposes clause of FMO's articles of incorporation is "to assist in assuring the provision of *adequate medical care* in Southwest and South Central Missouri and Northwest Arkansas." (Emphasis ours.) What does *adequate medical care* mean in this context? FMO seems to argue—and the Commission found—that *adequate medical care* implies in common parlance the providing of a medical clinic anywhere in Southwest and South Central Missouri and Northwest Arkansas. Specifically, the Commission's finding on this issue reads:

> "The evidence is clear and convincing that the subject property is used as a health care clinic, an activity intended to relieve persons of disease or suffering. *The corporate purposes of [FMO] encompasses [sic] this activity.*" (Emphasis added.)

We agree that, broadly speaking, the phrase *adequate medical care* may impart the meaning that FMO contends for and is implicit in the Commission's finding. Yet, nothing has been brought to our attention that ascribes to *adequate medical care* a universal or inflexible meaning. It is a phrase that implies certain circumstances, relationships, and qualities and requires particularization before its meaning can be precisely decided. *See Sundlun,* 273 A.2d at 285. In short, it is a phrase that requires construction by the court.

In doing this task, we look at George Flynn's testimony about why FMO was incorporated, the ends sought to be accomplished by the corporation, and his understanding of FMO's purposes.

"Q. [To George Flynn] Why was FMO incorporated?

A. FMO was incorporated *initially* out of a need that we identified working with the rural hospitals and their physicians in the communities locally. Many of the rural hospitals were seeing their medical staff leave and physicians leave the area to go to work in emergency rooms or the larger metropolitan areas because of their difficulties and their frustrations dealing with the business components of operating a medical practice. What we have tried to put together, FMO, was to take that burden off of the physicians by ... taking responsibility for the business component of the medical practice allowing them to practice medicine.

What this has done and the *end goal* was to retain quality primary care physicians in those rural areas and in any areas where there were inadequate numbers of family care, family practice physicians as well as providing something that would be attractive to new physicians coming out of school especially family practice, which there is a major shortage of family practitioners not only in this area but throughout the country. And, therefore, by putting together a package such as this where a new physician coming out of a residency program could enter into a practice with no capital cost and without the worrying about the business aspects which they're not trained to take care of, it has allowed us to recruit additional physicians and compete on a nationwide basis to get those residents that are coming out of school here locally. That was the original purpose.

Q. And, were there any specific problems that were identified that FMO felt or

that St. John's felt would be remedied by the creation or the incorporation of FMO?

A. Well, I think the number one is access to care. Because physicians were leaving the area. That, especially in the rural areas, resulted in problems of access to care, people having to drive 50, 60 miles to receive care. You know, there is an aging physician population or the physicians that are out in many of the rural areas or even here locally are ones that are facing retirement ... in the next 3 to 5 years. There needed to be physicians to replace those retiring physicians. Those were the main problems we identified." (Emphasis ours.)

Such testimony clearly says to us that FMO originally intended the term *adequate medical care* to mean enough physicians in each local community served by St. John's to ensure that persons living there could get physician care locally without traveling to other communities. That construction is consistent with a related provision of FMO's purposes clause, the paragraph C purpose "to develop efficient and practical arrangements for providing high quality primary care and related health services to *underserved areas* in Southwest and South Central Missouri and Northwest Arkansas." (Emphasis added.)

FMO's original application to Assessor for tax exemption suggests that, at that time, it had a more restrictive interpretation of its purposes than it now proposes. The tax-exempt application filed by FMO with Assessor was accompanied by a "statement of purpose" narrative. The narrative was prepared by FMO's counsel and reviewed by Flynn. Although not before this court, Flynn acknowledged that the narrative dealt "[w]ith rural problems as contrasted to problems of the urban areas such as Springfield."

Considering the context in which FMO's articles of incorporation were adopted, the original purpose to be achieved by FMO as explained by Flynn, and the evidence that establishes the construction FMO originally placed on its articles of incorporation, we conclude that FMO's corporate purposes restrict it to operating medical clinics *only* in local communities within St. John's service

area where there is a shortage of quality primary care physicians. Our construction of FMO's articles of incorporation in this manner comports with FMO's own declarations about why it was incorporated. It is a construction that is both fair and reasonable.

That the SMC property is not in an underserved area is undisputed. FMO's corporate officer testified the subject clinic is located in a growing residential neighborhood of immediately southwest Springfield, Missouri, and is "not located in a primary care health professional shortage area as identified by the Missouri Department of Health." Moreover, he testified FMO used the SMC property to serve local residents.

"Q. [to Flynn] The property that is the subject of this complaint, how is that property being used by FMO?

A. FMO is using that property like its other properties to operate and provide physician care, primary care to residents in the *neighborhood in which it is located*." (Emphasis added.)

Despite these facts, FMO now contends that the SMC property serves the overall purpose of FMO because it serves an area of population that does not have "convenient access to care." This is based on Flynn's testimony that most physicians in Greene County, Missouri, are located near the health centers in the area, whereas the SMC property "is a neighborhood clinic. In that neighborhood there are no physicians in that part of the town so in that regard ... [i]t is serving an area of population that doesn't have convenient access to care."

We regard this latter argument disingenuous at best in light of FMO's evidence as to the original reasons why it was incorporated. The idea of "convenient access to care" now argued by FMO as a corporate purpose is neither expressly stated in its articles nor implicitly encompassed in FMO's "adequate medical care" purpose as we interpret it. Based on our construction of its articles, the dominate charitable goal of FMO is "to establish a primary care network to assist in assuring the provision" of sufficient physicians in local communities served by St. John's so that persons living there could get

physician care locally without traveling to other communities. Although the subject property is being used as a medical clinic, it is not in an underserved community, i.e., in a "primary care shortage area," and, consequently, its use is not consistent with FMO's dominate charitable purpose. The arguments advanced by FMO to the contrary are rejected.

FMO also contends the subject property serves the overall purpose of FMO in that "the operation of this clinic and the other clinics in the network allows [FMO] to spread resources among the clinics, and to assist those clinics whose income will not meet their expenses." However, for that argument to be sound, any such profit can only be incidental and not a primary goal in the operation of the property. *See Tri–State Osteopathic Hospital,* 848 S.W.2d at 576. The not-for-profit requirement for a property to achieve tax exempt status as explained by the *Franciscan* court "does not mean that it is impermissible for the project at times or even fairly regularly to operate in the black rather than on a deficit basis." 566 S.W.2d at 224. Any gain, however, must be achieved "incidentally to accomplishment of the dominately charitable objective and ... not [as] a primary goal of the project." *Id.* Moreover, " 'an exemption will not be granted covering property which houses a business operated for the purpose of gaining a profit, even though it is turned over to a parent organization to be used for what are admittedly ... charitable purposes.' " *Sunday School,* 658 S.W.2d at 6 (quoting *Franciscan,* 566 S.W.2d at 224).

As part of its "spread the resources" argument, FMO says that its "purpose ... in using the subject property is to operate a family care health clinic to provide health care to the neighborhood residents and others who may come from outlying areas." That is an accurate description of the use to which FMO has put its SMC property. That does not, however, change the fact that such use is not consistent with what we have concluded to be FMO's dominate charitable objective. Under the circumstances, the SMC property is not "dedicated unconditionally to [a] charitable objective" and we cannot say that profit "is not the primary goal of the project." *See Sunday School,* 658 S.W.2d at 6. The most that can be said is that FMO is conducting a medical clinic and that the profits derived therefrom are being used for charitable purposes. That however, is not enough to meet the requirement that "the property 'must be dedicated unconditionally to the charitable activity.' " *Id.*

We are compelled to conclude that FMO has not sustained its "substantial burden" of proving that the SMC property falls within a class of property entitled to a charitable exemption. *See Sunday School,* 658 S.W.2d at 7. We hold that FMO's real estate at 2754 West Republic Road, Springfield, Missouri, is not exempt from taxation, that the Commission erred in finding that it was, and that the judgment of the trial court must be reversed.

The judgment is reversed.

FLANIGAN, J., concurs.

PARRISH, J., concurs in result in separate opinion.

PARRISH, Judge, concurring.

I concur in the result reached in the principal opinion. As it explains, *Franciscan Tertiary Prov. v. State Tax Commission,* 566 S.W.2d 213 (Mo. banc 1978), enunciates a test that property used for charitable purposes must meet in order to be exempt from ad valorem taxes. Three conditions must be satisfied. Failure to satisfy any of those conditions disqualifies property from being declared exempt. One condition is that the property is dedicated unconditionally to the charitable activity. This property does not meet that qualification.

A medical clinic is operated on the property in question. There is no indication that patients treated at this location could not obtain treatment at other nearby medical facilities. There is no indication that this clinic's method of operation differs from that of other physicians' offices in the Springfield, Missouri–Greene County area. Fees are charged. The amount of fees charged a particular patient depends on what services

were provided. Some are collected. Some are not.